RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 14a0179p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

Nos. 13-6056/6057/6156

COURTNEY JUNIOR NOBLE (13-6056), MARCUS JESSIE ADKINS (13-6057), and DENA LYNN BROOKS (13-6156),

*Defendants-Appellants.*

Appeal from the United States District Court
for the Eastern District of Kentucky at Lexington.
No. 5:13-cr-00017—Joseph M. Hood, District Judge.

Argued: June 25, 2014

Decided and Filed: August 8, 2014

Before: MOORE and KETHLEDGE, Circuit Judges; TARNOW, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Frederick J. Anderson, Lexington, Kentucky, for Appellant in 13-6056. Charles P. Gore, Lexington, Kentucky, for Appellant in 13-6156. Katherine A. Crytzer, UNITED STATES ATTORNEY'S OFFICE, Lexington, Kentucky, for Appellee. **ON BRIEF:** Frederick J. Anderson, Lexington, Kentucky, for Appellant in 13-6056. Charles P. Gore, Lexington, Kentucky, for Appellant in 13-6156. Adele Burt Brown, Lexington, Kentucky, for Appellant in 13-6057. Charles P. Wisdom, Jr., Robert M. Duncan, Jr., UNITED STATES ATTORNEY'S OFFICE, Lexington, Kentucky, for Appellee.

MOORE, J., delivered the opinion of the court, in which TARNOW, D.J., joined. KETHLEDGE, J. (pg. 24), delivered a separate dissenting opinion.

_____

[*]The Honorable Arthur J. Tarnow, Senior United States District Judge for the Eastern District of Michigan, sitting by designation.

_____

**OPINION**

_____

KAREN NELSON MOORE, Circuit Judge.  On the basis of a cooperating defendant's tip, a Drug Enforcement Administration ("DEA") task force set up surveillance along an interstate in eastern Kentucky, hoping to intercept members of a methamphetamine-trafficking operation.  After fits and starts, a member of the task force located a car suspected of involvement with the operation.  That task force member—Detective Robert Hart—trailed the automobile, a Chevrolet Tahoe, in an unmarked car, radioed a local officer, Adam Ray, and asked Officer Ray to initiate a traffic stop on the basis of a traffic violation.  Detective Hart told Officer Ray only that the car was suspected of being linked to a DEA drug investigation.

Officer Ray initiated the stop and discovered the Tahoe's driver—Defendant-Appellant, Marcus Jessie Adkins—and one passenger—Defendant-Appellant, Courtney Junior Noble. When Officer Ray approached the Tahoe, he noticed that Noble was very nervous.  Once Adkins gave Officer Ray permission to search the car, Officer Ray removed Noble from the Tahoe and frisked him for weapons on the basis of Noble's nervousness, the fact that the Tahoe was suspected in a DEA investigation, and that Officer Ray's training told him that drug traffickers are often armed.  Officer Ray found several baggies of methamphetamine, a pipe used for smoking drugs, and a handgun on Noble's person.  He arrested Noble and Adkins.  In addition, the task force used this evidence to obtain a search warrant for a motel room suspected of being a way station for the traffickers.  In the room, the task force found Defendant-Appellant Dena Lynn Brooks, pills, and a scale for weighing drugs.  A grand jury indicted all three on charges of possession with intent to sell methamphetamine and conspiracy to sell methamphetamine; it also indicted Noble on a gun charge.

Noble moved to suppress the evidence found as a result of Officer Ray's frisk.  Adkins and Brooks joined this motion, which the district court denied in full after holding a hearing.  On appeal, we conclude that Officer Ray lacked sufficient particularized and objective indicia to believe that Noble was armed and dangerous.  As a result, we **REVERSE** the district court's denial of Noble's motion to suppress, **VACATE** his conviction, and **REMAND** for proceedings

consistent with this opinion.  Because the government never objected to, and explicitly waived an argument related to, Adkins's and Brooks's lack of standing to challenge Officer Ray's frisk of Noble, we must also **REVERSE** the district court's denial of their motions to suppress, **VACATE** their convictions, and **REMAND** for proceedings consistent with this opinion.

## I.  BACKGROUND

In the fall of 2012, DEA Task Force Officer Scott McIntosh was investigating a methamphetamine-distribution network in Kentucky.  Working with a cooperating defendant, he became aware of Brooks's and Adkins's involvement in the drug ring.  Specifically, Officer McIntosh learned that Brooks would pick up ounce-level quantities of methamphetamine from her source of supply in Louisville, travel back to Lexington, and then meet with Adkins.  In turn, Adkins would take the methamphetamine to Wolfe and Powell Counties in eastern Kentucky where he would distribute it further.

In December 2012, Officer McIntosh interviewed Brooks.  For some reason, she confirmed that Adkins distributed methamphetamine in Wolfe and Powell Counties.  Brooks also told Officer McIntosh that "one of [Adkins's] customers . . . or one of the people that he supplied was . . . Noble."  R. 50 at 9:23–25 (Suppression Hr'g Tr.) (Page ID #223).

In January 2013, the cooperating defendant provided Officer McIntosh with a tip that Brooks would be traveling to Louisville on January 28 to purchase methamphetamine.  The cooperating defendant indicated that Brooks would drive a white Jeep Cherokee, gave the automobile's license plate number, and told Officer McIntosh that Brooks had to return to Lexington by 5:00 p.m.  On the 28th, Officer McIntosh and the DEA Task Force "established surveillance along the [Interstate] 75 corridor—or [Interstate] 64 corridor . . . going towards Louisville in an attempt to locate the white Jeep Cherokee . . . ."  *Id.* at 12:21–23 (Page ID #226).  The afternoon came and went without a sighting of the target vehicle.

At approximately 5:00 p.m., Officer McIntosh received a phone call from the cooperating defendant, and Officer McIntosh informed him that the Task Force had not located the white Jeep Cherokee.  The cooperating defendant told Officer McIntosh that Brooks might have used Adkins's dark-colored Chevrolet Tahoe instead of Brooks's Cherokee.  When Officer McIntosh

asked the cooperating defendant where Adkins and Brooks might be near Lexington, the cooperating defendant disclosed that he had visited Brooks at a motel room near Exit 115 off Interstate 75 and that he knew that Brooks and Adkins had utilized the motel as a way station on route to Wolfe and Powell Counties. The cooperating defendant believed that Adkins and Brooks might have stopped at the motel again.

With this information in hand, Officer McIntosh contacted Detective Hart, a Lexington police officer detailed to the DEA Task Force, and requested that he investigate whether the white Cherokee or the dark-colored Tahoe were at a motel near Exit 115. Detective Hart located the two automobiles in the parking lot behind a La Quinta Inn and set up surveillance in another parking lot adjacent to the motel. Shortly thereafter, the Tahoe left the motel parking lot and started traveling toward the interstate. Detective Hart followed, "maintained surveillance" in his unmarked automobile, and "attempt[ed] to reach a uniformed officer to conduct a traffic stop."[1] *Id.* at 32:13–15 (Page ID #246).

Detective Hart eventually reached Officer Ray, a "[p]atrol officer with the Lexington Fayette Urban County Government Division of Police." *Id.* at 55:14–15 (Page ID #269). According to Detective Hart, he "relayed to [Officer Ray] that [the DEA Task Force was] involved in conducting surveillance on a group that was involved in distributing methamphetamine and that [Detective Hart] didn't know who was in the vehicle, didn't know anything about any weapons but basically the group was involved in meth." *Id.* at 33:2–7 (Page ID #247); *see also id.* at 57:16–58:2 (Page ID #271–72) (Officer Ray confirming Detective Hart's statement).

Officer Ray caught up with the Tahoe as it was traveling eastbound on Interstate 64. He "evened [his] front bumper with the rear bumper of the Tahoe, and immediately [up]on doing that, the Tahoe hit his brake lights to slow down; and [Officer Ray] watched [the Tahoe] cross from the center lane briefly into the right lane [without using his turn signal]." *Id.* at 59:4–8 (Page ID #273). In addition, Officer Ray "looked in the driver's window and observed that the

---

[1]During an undercover investigation, if it is necessary to stop a suspect's vehicle, law enforcement will sometimes request that a marked patrol car initiate a traffic stop based on a traffic infraction in order to avoid disclosing the larger investigation's existence. This type of stop, according to Officer McIntosh, is referred to as a "wall off stop." R. 50 at 20:2–12 (Suppression Hr'g Tr.) (Page ID #234).

front window tints appeared to be excessively dark[,] and [he] was unable to see the driver at that time." *Id.* at 59:14–18 (Page ID #273). Based on these two observations, Officer Ray "activated [his] emergency equipment and pulled the vehicle over." *Id.* at 59:20–22 (Page ID #273). A few moments later, Detective Hart pulled over fifty yards behind Officer Ray's patrol car.

Officer Ray approached the Tahoe "from the passenger side . . . to catch [the vehicle occupants] off guard." *Id.* at 62:8–9 (Page ID #276). Officer Ray informed the driver, who the police eventually learned was Adkins, that he had stopped the Tahoe for crossing lanes without signaling and for having excessive window tinting. While standing at the passenger-side window, Officer Ray noticed that the passenger, who turned out to be Noble, was "extremely nervous." *Id.* at 61:19 (Page ID #275). In his right hand, the passenger had a can of Ale-8-One, a soft drink popular in eastern Kentucky, and "it was shaking a lot more than [Officer Ray thought] it should have been . . . ." *Id.* at 61:15–16 (Page ID #275). Even though Officer Ray thought the passenger's behavior strange, as "there is really no reason for someone to be that nervous based on the traffic stop unless something else is going on," he continued with the traffic stop, taking Adkins's driver's license and vehicle registration and returning to his cruiser. *Id.* at 61:13–25 (Page ID #275).

Officer Ray then grabbed his tint meter and tested the Tahoe's windows. He found them to be in violation of Kentucky law. *See* Ky. Rev. Stat. Ann. § 189.110(4). Next, Officer Ray asked Adkins to step out of the Tahoe because Officer Ray suspected Adkins of driving under the influence, apparently because he crossed the lane line without signaling. Adkins explained this deviation as the result of looking at his phone, but Officer Ray administered a field sobriety test anyway.[2] Adkins passed the test, and Officer Ray began to question him regarding the passenger. Adkins could not explain why his passenger was so nervous. When asked "if there was anything illegal on him or in the vehicle," he replied: "Not to my knowledge." R. 50 at 63:11–13 (Suppression Hr'g Tr.) (Page ID #277) (internal quotation marks omitted). Adkins then gave Officer Ray permission to search the Tahoe.

---

[2]About this time, Detective Hart approached the passenger side of the Tahoe and ordered Noble to place his hands on the dashboard. Detective Hart testified that he did this out of a concern for "officer safety" and because "[i]t was dark." R. 50 at 49:5 (Suppression Hr'g Tr.) (Page ID #263). Noble complied fully.

After Adkins consented to the search, Officer Ray frisked him "just to make sure [Adkins] didn't have anything illegal on him." *Id.* at 63:18–19 (Page ID #277). Adkins did not have contraband or a weapon on his person. Officer Ray then led Adkins over to Detective Hart and turned his attention to the passenger. Officer Ray informed the passenger, who still had not been identified as Noble, that Adkins had given Officer Ray permission to search the Tahoe and that Noble needed to step out of the car. At this point, Noble "still seemed extremely nervous [to Officer Ray]." *Id.* at 64:22 (Page ID #278). Officer Ray "explained to . . . Noble that he was going to be patted down for weapons as well while the vehicle was searched." *Id.* at 65:5–7 (Page ID #279). Officer Ray testified that he felt a frisk was necessary for officer safety because of Noble's nervousness[3] and the fact that he was in a car suspected of being involved in methamphetamine trafficking. In Officer's Ray's "training and experience, subjects that are involved in narcotics more times than not will carry a weapon to protect themselves from being robbed . . . ."[4] *Id.* at 75:14–17 (Page ID #289).

Officer Ray placed Noble's hands behind Noble's back, grabbed Noble's two index fingers in one hand, and had Noble separate his feet. Officer Ray then started patting down Noble's right pocket and right waistband because, as he testified, "[m]ost people are right-handed [and] if they were to have a weapon, that's where it would be." *Id.* at 65:23–24 (Page ID #279). In Noble's pocket, Officer Ray felt what he believed to be crack cocaine. He "heard the crumpling of a plastic bag, and [the object] had the feel and texture of suspected crack cocaine." *Id.* at 66:3–5 (Page ID #280). Officer Ray further testified that the substance had the feeling of "thick sand," and when he asked Noble what the object was, Noble eventually responded: "I don't know." *Id.* at 66:13, 66:24 (Page ID #280) (internal quotation marks omitted). With that response and believing that the object was contraband (based on his five years of training and experience), Officer Ray removed the object and identified it as methamphetamine. Continuing the search, Officer Ray discovered two other baggies of methamphetamine, a pill bottle, a glass

---

[3]Officer Ray elaborated that "[t]he nervousness of the passenger . . . made [him] think that there was something going on, that there was something illegal in the car, that somebody had a warrant, etc." R. 50 at 83:2–5 (Suppression Hr'g Tr.) (Page ID #297).

[4]In addition, Officer Ray justified the frisk on the basis of his "location being fairly remote out on the freeway as well as being outnumbered at the time two to one . . . ." R. 50 at 75:18–20 (Suppression Hr'g Tr.) (Page ID #289).

smoking pipe, and a loaded pistol on Noble's person. Officer Ray arrested Noble for suspected possession of narcotics and placed him in the back of the patrol car.

While Officer Ray was frisking Noble, Detective Hart was interviewing Adkins. According to Detective Hart, Adkins admitted to driving Noble to "purchase narcotics." *Id.* at 36:25 (Page ID #250). The officers also arrested Adkins.[5] After placing Adkins with Noble in the patrol car, Officer Ray transported them to the DEA office, where Officer McIntosh interviewed Adkins, and then Officer Ray took them on to the Fayette County Detention Center. During intake at the detention center, the jail officials found seventeen $100 bills in Noble's sock.

As this traffic stop took place, other members of the DEA Task Force continued to watch the motel room, and Task Force Officer Jose Batiste "observed [Brooks] leaving the motel room to go out to her vehicle." *Id.* at 26:14–15 (Page ID #240). Based on this surveillance, information from the traffic stop, and Officer McIntosh's interview with Adkins, Officer McIntosh obtained a warrant to search Brooks's motel room. Inside the motel room, the DEA Task Force found "a set of scales[,] which [the officers] commonly [knew] to be used [for] measuring different weights of drugs along with some Ziploc baggies, and then . . . some pills on [Brooks's] person." *Id.* at 19:22–20:1 (Page ID # 233–34). The officers arrested Brooks.

On the basis of this evidence, a grand jury indicted Noble, Adkins, and Brooks each on one count of knowingly and intentionally possessing with the intent to distribute fifty grams or more of a mixture or substance containing methamphetamine, in violation of 21 U.S.C. § 841(a)(1), and one count of conspiring to violate 21 U.S.C. § 841(a)(1), in violation of 21 U.S.C. § 846. R. 1 at 1–2 (Indictment) (Page ID #1–2). In addition, the grand jury indicted Noble on one count of knowingly and intentionally possessing a firearm in furtherance of a drug-trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A). *Id.* at 2 (Page ID #2).

On March 19, 2013, Noble moved to suppress the evidence seized on January 28, 2013, arguing that Officer Ray lacked reasonable suspicion that Noble was armed and dangerous to

---

[5]Officer Ray never issued a citation for the excessive window tinting or for crossing the lane line without signaling.

frisk him.  R. 27-1 at 2 (Noble Mem. in Support of Mot. to Suppress) (Page ID #52).  A few days later, Brooks filed a motion with the district court, requesting that she be allowed to "adopt the suppression motion filed by Courtney Noble, Jr."  R. 32 at 1 (Brooks Mot.) (Page ID # 63).  The district court granted this motion and gave Adkins leave to join the motion to suppress evidence as well, R. 34 at 1–2 (D. Ct. Adoption Order) (Page ID #68–69), which he did the next day, R. 36 at 1 (Adkins Mot.) (Page ID #73).  The government opposed the defendants' motions, arguing that Officer Ray had probable cause to stop Adkins's Tahoe and that he had reasonable suspicion to frisk Noble.  R. 39 at 5–7 (Gov't Resp.) (Page ID #83–85).  On April 15, 2013, the district court held a suppression hearing at which Officer McIntosh, Detective Hart, and Officer Ray testified.

The defendants filed a joint memorandum of law in support of suppression on April 25, 2013.  They put forward several arguments.  One, the defendants contended that Officer Ray no longer had cause to detain the vehicle's occupants once he checked the window tint and Adkins's sobriety and, therefore, that the stop exceeded its lawful purpose when Officer Ray continued to question the passengers.  R. 55 at 5–6 (Joint Mot. to Suppress) (Page ID #326–327).  Two, they argued that Officer Ray lacked reasonable suspicion, based on his interactions with the vehicle occupants, to pat down Noble.  *Id*.  The government disagreed with both arguments and attempted to rebut them on their own terms.  R. 56 at 1–4 (Gov't Sur-Reply) (Page ID #333–336).

On April 30, 2013, the district court issued a memorandum opinion and order, denying the defendants' motions to suppress.  First, the district court found that the "traffic stop was ongoing when [Officer] Ray asked for and received consent to search the vehicle . . . ."  R. 57 at 9 (D. Ct. Op.) (Page ID #346).  As a result, Officer Ray did not impermissibly extend the stop beyond its proper scope.  Second, the district court found that "Officer Ray reasonably concluded that Noble might be armed and dangerous" on the basis of his extreme nervousness, Officer's Ray's knowledge that the vehicle was suspected to be involved with drug trafficking, and Officer Ray's experience that drug traffickers routinely carry weapons.  *Id.* at 11–12 (Page ID #348–49).  Finally, the district court opined that, even though the issue went unraised by the parties, Officer

Ray's frisk was not "physically too intrusive," which would be a violation of the plain-feel doctrine. *Id.* at 12–13 (Page ID #349–50).

Having failed to suppress the evidence against them, the defendants entered into conditional plea agreements with the government. Adkins and Brooks agreed to plead guilty to one violation of 21 U.S.C. § 846 (conspiracy to distribute fifty or more grams of a mixture or substance containing methamphetamine) in exchange for the government dismissing the 21 U.S.C. § 841(a)(1) charges. R. 72 at 1 (Adkins Plea Agreement) (Page ID #387); R. 68 at 1 (Brooks Plea Agreement) (Page ID #373). Noble agreed to plead guilty to one violation of 21 U.S.C. § 841(a)(1) (possession with intent to distribute fifty or more grams of a mixture or substance containing methamphetamine) and one violation of 18 U.S.C. § 924(c)(1)(A) (possession of a firearm in furtherance of a drug-trafficking offense). R. 76 at 1 (Noble Plea Agreement) (Page ID #401). In exchange, the government agreed to dismiss the 21 U.S.C. § 846 conspiracy charge. *Id.* All three defendants preserved their rights to appeal the district court's suppression ruling. *See id.* at 4 (Page ID #404); R. 72 at 4 (Adkins Plea Agreement) (Page ID #390); R. 68 at 4 (Brooks Plea Agreement) (Page ID #373). This consolidated appeal follows.

## II. ANALYSIS

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. Consistent with this amendment, a police officer may effect a traffic stop if the officer "possess[es] either probable cause of a civil infraction or reasonable suspicion of criminal activity." *United States v. Lyons*, 687 F.3d 754, 763 (6th Cir. 2012) (citing *Gaddis ex rel. Gaddis v. Redford Twp.*, 364 F.3d 763, 771 n.6 (6th Cir. 2004)). In this case, the defendants do not contend that Officer Ray lacked probable cause to stop Adkins for excessively tinted windows or crossing the lane line without signaling. Rather, they offer three separate arguments related to Officer Ray's conduct during the stop. First, the defendants claim that Officer Ray inappropriately prolonged the stop. Second, they argue that Officer Ray lacked reasonable suspicion to pat down Noble. Third, they argue that even if Officer Ray had reasonable suspicion to frisk Noble, his manipulation of Noble's pocket constituted a full-blown search for which there was no probable cause.

Ultimately, we conclude that Officer Ray did not impermissibly prolong the stop, but that he lacked reasonable suspicion to frisk Noble.[6]  As a result, we **REVERSE** the denial of the motions to suppress, **VACATE** the guilty pleas, and **REMAND** for further proceedings consistent with this opinion.

## A.  Standard of Review

"When reviewing the denial of a motion to suppress, we review the district court's findings of fact for clear error and its conclusions of law de novo, considering the evidence in the light most favorable to the government."  *United States v. Richards*, 659 F.3d 527, 536 (6th Cir. 2011) (citing *United States v. Lucas*, 640 F.3d 168, 173 (6th Cir. 2011)).  Whether a seizure was unreasonable is a question of law that we review de novo.  *United States v. Blair*, 524 F.3d 740, 747 (6th Cir. 2008).  "Whether an officer had reasonable suspicion under the circumstances [to frisk a suspect] is a mixed question of law and fact that we review de novo."  *United States v. Stepp*, 680 F.3d 651, 660 (6th Cir. 2012) (citing *United States v. Bell*, 555 F.3d 535, 539 (6th Cir. 2009)).  In addition, we may affirm the district court's decision to deny the motion to dismiss for any reason supported by the record and the arguments of the parties.  *United States v. Pasquarille*, 20 F.3d 682, 685 (6th Cir. 1994).

## B.  Duration of Stop

"The Fourth Amendment applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest."  *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975) (citing *Davis v. Mississippi*, 394 U.S. 721[, 727] (1969); *Terry v. Ohio*, 392 U.S. 1, 16–19 (1968)).  "When a police officer makes a traffic stop, the driver of the car is seized within the meaning of the Fourth Amendment."  *Brendlin v. California*, 551 U.S. 249, 251 (2007).  The same is true for any passengers.  *Id.*

For many traffic stops, "the purpose of the stop is limited and the resulting detention [is] quite brief."  *Delaware v. Prouse*, 440 U.S. 648, 653 (1979) (citations omitted).  As a result, "the usual traffic stop is more analogous to a so-called '*Terry* stop' than to a formal arrest."

---

[6]Given that the defendants' second argument is dispositive of the case, we decline to reach their third argument related to the plain-feel doctrine.

*Berkemer v. McCarty*, 468 U.S. 420, 439 (1984) (internal citations omitted).  And as with *Terry* stops, "the [traffic] stop and inquiry must be 'reasonably related in scope to the justification for their initiation.'"  *Brignoni-Ponce*, 422 U.S. at 881 (quoting *Terry*, 392 U.S. at 29).  "Typically, this means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." *Berkemer*, 468 U.S. at 439; *but see Muehler v. Mena*, 544 U.S. 93, 101–02 (2005) (upholding questioning slightly more afield as reasonable).  "The scope of the intrusion permitted will vary to some extent with the particular facts and circumstances of each case," but the duration of the stop must not be "longer than is necessary to effectuate the purpose of the stop."  *Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality).

Importantly, "a seizure that is lawful at its inception can [still] violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution."  *Illinois v. Caballes*, 543 U.S. 405, 407 (2005) (citing *United States v. Jacobsen*, 466 U.S. 109, 124 (1984)).  More specifically, "[a] seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission."  *Id.*; *see also Hiibel v. Sixth Judicial Dist. Court of Nev.*, 542 U.S. 177, 185–86 (2004) (noting that a "seizure cannot continue for an excessive period of time").

In this case, the defendants contend that Officer Ray's detention of the Tahoe was excessive in scope and impermissibly long in duration.  They are mistaken.  Officer Ray stopped the Tahoe with probable cause to believe that two traffic violations had occurred.  He immediately questioned the driver regarding his identity and his reasons for crossing the lane line.  *See* R. 50 at 60:14–61:4 (Suppression Hr'g Tr.) (Page ID #274–75).  Officer Ray then collected his tint meter and checked the Tahoe's windows.  *Id.* at 62:12–17 (Page ID #276).  After testing the windows and returning to speak with Adkins, Officer Ray administered a field sobriety test to ensure that Adkins's erratic driving was not the result of chemical impairment. *Id.* at 62:18–63:6 (Page ID # 276–77).  Each of these actions relates directly to the professed purpose for the initial stop and is an acceptable "means of investigation . . . likely to confirm or dispel [the officer's] suspicions quickly . . . ."  *United States v. Davis*, 430 F.3d 345, 354 (6th

Cir. 2005) (internal quotation marks omitted). Moreover, all of this happened within a few minutes. *See* R. 50 at 45:11–12 (Suppression Hr'g Tr.) (Page ID #259); R. 57 at 10 (D. Ct. Op.) (Page ID #347). Therefore, none of these actions, under these facts, offends the Fourth Amendment.

From the defendants' rather muddled briefs and oral arguments, it appears that they concede the constitutionality of these actions. Instead, they contend that "[o]nce the officer determined the tint on the windows was too dark and that [the] driver was not intoxicated, there was no additional evidence to be found by searching the individuals or the vehicle." Noble Br. at 18. In particular, they object to Officer Ray's request for consent to search the vehicle. *Id.*; *see also* Brooks Br. at 11; Brooks Reply Br. at 2–3. For support, they cite *Knowles v. Iowa*, 525 U.S. 113 (1998), and *United States v. Mesa*, 62 F.3d 159 (6th Cir. 1995). These cases, however, are easily distinguished.

First, *Knowles* involved a challenge to a state law permitting a full-blown search incident to a traffic citation (as opposed to a custodial arrest). 525 U.S. at 114. The Supreme Court never discussed the proper scope or duration of the stop, and thus, this case is irrelevant to the issue at hand. Second and similarly, *Mesa* provides little help to the defendants. In *Mesa*, a panel of this court held that "[o]nce the purposes of the initial traffic stop were completed, there is no doubt that the officer could not further detain the vehicle or its occupants unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention." 62 F.3d at 162. Unfortunately for the defendants, Officer Ray had not yet finished the initial stop by issuing a citation or allowing Adkins and Noble to leave. *See Stepp*, 680 F.3d at 662; *United States v. Garrido-Santana*, 360 F.3d 565, 575 (6th Cir. 2004). Importantly, there is no evidence in the record suggesting that Officer Ray unreasonably prolonged the stop. Only a few minutes passed between when Officer Ray stopped the Tahoe and when he asked for consent to search. *See* R. 50 at 45:11–12 (Suppression Hr'g Tr.) (Page ID #259). Moreover, Officer Ray's questioning was not so extraneous and unrelated to the subject of the stop as to broaden the scope of the detention unreasonably.[7] *See United States v. Everett*, 601 F.3d 484,

---

[7]At oral argument, Brooks's attorney conceded that the Constitution permitted Officer Ray to ask for permission to search the Tahoe.

495–96 (6th Cir. 2010) (citing cases upholding extraneous questioning up to thirteen minutes as de minimis).  He asked why Adkins's passenger was so nervous, whether Adkins had contraband in the vehicle, and whether Officer Ray could search the vehicle.  *See United States v. Branch*, 537 F.3d 582, 588 (6th Cir. 2008) (reaffirming that "police officers do not violate the Fourth Amendment by asking an individual questions after the initial stop has ended" (citation omitted)).  None of this approaches the extreme circumstances of *Mesa*[8] or offends the more recent standards set forth by the Supreme Court and this circuit.  *See, e.g.*, *Arizona v. Johnson*, 555 U.S. 323 (2009); *Everett*, 601 F.3d at 484.  Accordingly, we conclude that Officer Ray did not unreasonably detain Adkins and Noble prior to his frisk of Noble.

## C.  Reasonable Suspicion for Frisk

Most traffic stops represent a minor inconvenience to the vehicle's occupants, *Knowles*, 525 U.S. at 117, but they "are 'especially fraught with danger to police officers,'"[9] *Johnson*, 555 U.S. at 330 (quoting *Michigan v. Long*, 463 U.S. 1032, 1047 (1983)).  As a result, police officers may order drivers and passengers out of the automobile during the traffic stop without offending the Fourth Amendment.  *Maryland v. Wilson*, 519 U.S. 408, 414 (1997).  However, while this interest in officer safety is "legitimate and weighty," *Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977), an officer may "perform a 'patdown' of a driver and any passengers [only] upon reasonable suspicion that they may be armed and dangerous." *Knowles*, 525 U.S. at 118 (citing *Terry*, 392 U.S. 1).

"Reasonable suspicion is based on the totality of the circumstances," *Joshua v. DeWitt*, 341 F.3d 430, 443 (6th Cir. 2003) (citation omitted), and it exists if "a reasonably prudent

---

[8]In *Mesa*, the police officer issued a traffic citation to the driver for speeding and then kept the driver in the back of the police cruiser while continuing to ask her questions.  62 F.3d at 161.  The officer then asked the driver whether he could search the vehicle, misrepresented the consent-to-search form, placed the passenger and her children in the police cruiser, and waited for a drug dog to arrive.  *Id.*  The drug dog did not alert, but the police officers on the scene then went rummaging through the trunk of the car and found nothing.  *Id.*  Undeterred, they then found a partition in the trunk, pried it open, and found drugs at that point.  *Id.*  Perhaps unsurprisingly, we held this sequence of events to be contrary to the Fourth Amendment's protections.  However, as the government has pointed out, *Mesa* is no longer good law in this circuit.  *See United States v. Aguilera-Pena*, 426 F. App'x 368, 370 (6th Cir. 2011) (recognizing, perhaps incorrectly, that *Ohio v. Robinette*, 519 U.S. 33, 39 (1996), abrogates *Mesa*); *United States v. Burton*, 334 F.3d 514, 517 (6th Cir. 2003) (same); *see Robinette*, 519 U.S. at 38 (expressly declining to address whether the stop exceeded its lawful scope).

[9]See *Maryland v. Wilson*, 519 U.S. 408, 413 (1997) (noting that an inordinate number of officer assaults and deaths occur during traffic stops); *Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977) (same).

[person] in the circumstances would be warranted in the belief that his [or her] safety or that of others was in danger," *Terry*, 392 U.S. at 27. This standard is an objective one. *Id.* at 22 ("If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be secure in their persons, houses, papers, and effects, only in the discretion of the police." (internal quotation marks omitted)). Moreover, "[r]easonable suspicion 'requires more than a mere hunch . . . .'" *Lyons*, 687 F.3d at 763 (quoting *Dorsey v. Barber*, 517 F.3d 389, 395 (6th Cir. 2008)). It demands "a particularized and objective basis for suspecting [that] *the particular person*" is armed and dangerous. *United States v. Cortez*, 449 U.S. 411, 417 (1981) (emphasis added); *see also Ybarra v. Illinois*, 444 U.S. 85, 94 (1979) ("The 'narrow scope' of the *Terry* exception [to the Fourth Amendment's warrant requirement] does not permit a frisk for weapons on less than reasonable belief or suspicion directed *at the person* to be frisked . . . ." (emphasis added)); *United States v. Wilson*, 506 F.3d 488, 492 (6th Cir. 2007).

In this case, the government articulates three pieces of information[10] that, it claims, justify Officer Ray's frisk of Noble. One, Noble was "'extremely nervous.'" Appellee Br. at 21–22 (quoting R. 50 at 61:19 (Suppression Hr'g Tr.) (Page ID #275)). Two, Detective Hart alerted Officer Ray to the fact that the DEA Task Force suspected that the vehicle was connected to methamphetamine trafficking. *Id.* at 21. And three, Officer Ray's training and experience taught him that "'subjects that are involved in narcotics more times than not will carry a weapon to protect themselves . . . .'" *Id.* at 22 (quoting R. 50 at 75:14–16 (Suppression Hr'g Tr.) (Page ID #289)). While this situation, admittedly, poses a close question, we hold that these three factors do not add up to reasonable suspicion in this case.

---

[10]Officer Ray also stated that "[o]n top of that . . . with my location being fairly remote out on the freeway as well as being outnumbered at the time two to one, I had a[n] articulable reason to pat Mr. Noble down . . . ." R. 50 at 75:18–21 (Suppression Hr'g Tr.) (Page ID #289). First, Officer Ray's own testimony contradicts his claim that he was outnumbered two to one. *See id.* at 76:18–21 (Page ID #290); *see also id.* at 45:11–20 (Page ID #259) (Detective Hart testifying that he was on the scene before Officer Ray went to pat down Noble); *id.* at 49:2–5 (Page ID #263) (Detective Hart testifying that he directed Noble to place his hands on the dashboard while Officer Ray spoke with Adkins). Second, while we do not doubt that a stop in a remote location may present more of a danger to a police officer, we fail to see how the location of the stop, when the stop takes place on the interstate, or the time of day makes a suspect more or less likely to possess a weapon. As a result, we do not consider these factors in analyzing whether Officer Ray had reasonable suspicion to believe Noble was armed and dangerous at the moment he began the roadside frisk.

Time and again, we have said that nervousness—even extreme nervousness—"is an unreliable indicator" of someone's dangerousness, "especially in the context of a traffic stop." *United States v. Richardson*, 385 F.3d 625, 630 (6th Cir. 2004); *see, e.g., Wilson*, 506 F.3d at 495–96 ("Nervous behavior, standing alone, is not enough to justify a *Terry* search."); *United States v. Henry*, 429 F.3d 603, 613 (6th Cir. 2005) ("[W]e have repeatedly discounted the value of nervousness in the reasonable-suspicion calculus."); *United States v. Noble*, 364 F. App'x 961, 970–71 (6th Cir. 2010) (Moore, J., dissenting) (collecting other cases). After all, "[m]any citizens become nervous during a traffic stop, even when they have nothing to hide or fear." *Richardson*, 385 F.3d at 630–31. Officer Ray testified that Noble was unusually nervous, *see* R. 50 at 61:19 (Suppression Hr'g Tr.) (Page ID #275), but after Officer Ray noticed Noble's condition, he proceeded to return to his cruiser, evaluate the window tint, and perform a field sobriety test upon Adkins before moving to frisk Noble, *id.* at 62:12–64:19 (Page ID #277–79). Officer Ray did not testify that Noble became noticeably more nervous as the stop progressed. *See Branch*, 537 F.3d at 589 (finding reasonable suspicion, in part, because the suspects "exhibit[ed] extraordinary nervousness that increased as the traffic stop progressed"). Nor is there testimony that Adkins or Noble failed to comply with any of the officers' commands. This sequence of events, the officers' actions after noticing Noble's nervousness and the suspects' compliance with all commands, serves to discount substantially the relevance of Noble's nervousness. Accordingly, we afford very little weight to Noble's nervousness in our reasonable-suspicion calculus.

Likewise, a person's mere presence in a car, which the police believe is connected to drug trafficking, is not an automatic green light for frisking that person. *United States v. Bell*, 762 F.2d 495, 499 (6th Cir. 1985) ("[A] person, by mere presence in a suspected car, [does not] lose[] immunities from search of his person to which he would otherwise be entitled." (internal quotation marks omitted)); *cf. Ybarra*, 444 U.S. at 91 ("[A] person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." (citing *Sibron v. New York*, 392 U.S. 40, 62–63 (1968)). The Supreme Court has made clear that an officer must have specific, articulable reasons to believe that a particular person is armed and dangerous before the officer may frisk a suspect. *Cortez*, 449 U.S. at 417; *Ybarra*, 444 U.S. at 90–91; *United States v. Di Re*, 332 U.S. 581, 587 (1948).

We think that *Ybarra* is particularly illuminating. In that case, the police acquired a warrant to search the Aurora Tap Tavern on suspicion that the bartender was dealing heroin from behind the bar. *Ybarra*, 444 U.S. at 90. Ybarra was a patron in the bar at the time the police executed the search warrant, and the officers frisked him despite being entirely ignorant as to Ybarra's identity and lacking any reason to believe that he was armed. *Id.* at 90–91, 93. The frisk turned up heroin. *Id.* at 89. The Court ordered the evidence suppressed, noting that the police "neither recognized him as a person with a criminal history nor had any particular reason to believe that he might be inclined to assault them." *Id.* at 93. Additionally, the Court pointed out that "Ybarra['s] . . . hands were empty, [he] gave no indication of possessing a weapon, made no gestures or other actions indicative of an intent to commit an assault, and acted generally in a manner that was not threatening." *Id.*

Similarly, Officer Ray did not recognize Adkins or Noble as persons with a criminal history. *See* R. 50 at 80:13–16 (Suppression Hr'g Tr.) (Page ID #294). Officer Ray did not testify that Noble gave him any reason to suspect that he was inclined to assault the officers, nor did Officer Ray testify that Noble had anything in his hands (besides a can of Ale-8-One), that Noble indicated that he had a weapon, or that Noble behaved in a threatening manner. Nor did Officer Ray testify that Noble was "avoiding all eye contact with [the officers]; . . . was fidgeting with [his pockets]; [or was] concealing something . . . ." *United States v. Oliver*, 550 F.3d 734, 738–39 (8th Cir. 2008) (internal quotation marks omitted); *see also* Wayne R. LaFave et al., 4 *Search and Seizure: A Treatise on the Fourth Amendment* § 9.6(a) (5th ed. 2013) (text accompanying notes 80–95, collecting behaviors sufficient for a frisk). Rather, the officers testified that Adkins and Noble complied with all commands, that Adkins passed his field-sobriety test, and that Noble kept his hands on the dashboard, as asked by Detective Hart. Without some sort of action on the part of Noble, besides his mere presence in a vehicle suspected of being involved in the drug trade, we cannot hold that Officer Ray had a reasonable belief that he was in danger, which would permit him to conduct a frisk of Noble.

In so holding, we are not unmindful of Officer Ray's belief that individuals involved in drug trafficking are generally armed. We have recognized before that a police officer, like Officer Ray, can "rely on his [or her] training and experience that drug dealers frequently carry

weapons . . . ." *Branch*, 537 F.3d at 589; *see also United States v. Jacob*, 377 F.3d 573, 579 (6th Cir. 2004) (holding same); *United States v. Heath*, 259 F.3d 522, 530 (6th Cir. 2001) (same). However, we have always required some corroboration that particular individuals are involved in dealing drugs before allowing a frisk for weapons. *See, e.g.*, *Branch*, 537 F.3d at 589 (upholding a patdown after a drug dog had alerted to the presence of narcotics in the automobile); *United States v. Garcia*, 496 F.3d 495, 505 (6th Cir. 2007) (upholding a patdown after officers overheard passengers—all suspected drug dealers—discussing weapons); *Noble*, 364 F. App'x at 965 (upholding patdown when officers smelled marijuana in the car).

Here, there is no specific fact that links Noble to the drug-trafficking operation beyond the Tahoe. Detective Hart never saw the occupants of the Tahoe at the La Quinta Inn, let alone saw them do something suspicious. *Cf. Heath*, 259 F.3d at 528–29 (6th Cir. 2001) (holding that there was reasonable suspicion after the police observed the suspect, who had a prior drug-trafficking conviction, at suspected drug locations, engaging in suspicious behavior). Officer Ray did not recognize Adkins as a drug trafficker, nor did he have any idea who Noble was prior to the frisk.[11] *Cf. Bell*, 762 F.2d at 501 (holding that there was reasonable suspicion, in part, because a suspect's companion was known to be armed and dangerous). As a result, there is nothing linking Noble to the drug-trafficker profile that might allow for a frisk.[12] We think that the Fourth Amendment requires such a link. *See United States v. Moore*, 390 F. App'x 503, 507 (6th Cir. 2010) (upholding the suppression of evidence, in part, because the police officer never

---

[11]While the knowledge of fellow officers can be imputed to an arresting officer in some cases, *see Feathers v. Aey*, 319 F.3d 843, 848–49 (6th Cir. 2003), we cannot consider any of the DEA Task Force's collective knowledge here because neither Detective Hart nor any other DEA Task Force member shared any information related to Adkins, Brooks, or Noble with Officer Ray. Detective Hart told Officer Ray only that the car was being investigated as part of a methamphetamine-trafficking investigation. R. 50 at 53:7–19 (Suppression Hr'g Tr.) (Page ID #267). Neither Detective Hart nor Officer Ray had any idea initially who was in the Tahoe. Officer Ray did not testify that he recognized Adkins as a suspected drug trafficker after learning his name through the license check. Neither officer testified that Officer Ray shared Adkins's name with Detective Hart prior to the frisk of Noble or that Detective Hart filled Officer Ray in on who Adkins was. *See id.* at 47:3–5 (Page ID #261) (Detective Hart unable to recall whether he and Officer Ray spoke before Officer Ray frisked Noble). Therefore, this case is distinguishable from *Bell*.

[12]It is also important to keep in mind that Officer Ray stopped Adkins and Noble for two traffic violations, not for drug trafficking. Various courts have held that police officers have an automatic right to frisk a suspect if they seize him or her on suspicion of having committed certain inherently violent crimes. *See, e.g.*, *United States v. McMullin*, 739 F.3d 943, 946–47 (6th Cir. 2014) (collecting cases related to burglary); LaFave et al., 4 *Search and Seizure* § 9.6(a) (text accompanying notes 55–78, collecting cases related to other crimes). Traffic violations do not, in and of themselves, give rise to this automatic right to frisk. *United States v. McKoy*, 428 F.3d 38, 40 (1st Cir. 2005). We save for another day whether a stop based upon suspicion of drug trafficking automatically allows the police to frisk the suspect.

corroborated that individuals in a car with suspected ties to drug trafficking had links, themselves, to drugs). Otherwise, the police could frisk any "nervous" passenger, who is in a car suspected of having drug-trafficking ties, including a fourth grader, a ninety-five-year-old gentleman with Parkinson's disease, or a judge of this court.

Furthermore, requiring this corroboration before police officers may frisk a suspect does not leave officers without any means of protecting themselves.[13] Police officers may ask a few questions regarding weapons and criminal activity, regardless of the stop's original purpose. *See Everett*, 601 F.3d at 495–96; *Bell*, 762 F.2d at 501 n.8; *but see Terry*, 392 U.S. at 33 (Harlan, J., concurring) ("There is no reason why an officer, rightfully but forcibly confronting a person suspected of a serious crime, should have to ask one question and take the risk that the answer might be a bullet."). Police officers may also order vehicle drivers and passengers out of the vehicle without asking any questions. *Wilson*, 519 U.S. at 410 (passengers); *Mimms*, 434 U.S. at 111 (drivers). In some circumstances, police officers may even place vehicle occupants into the back of a police cruiser while a search is conducted. *See, e.g., United States v. Bradshaw*, 102 F.3d 204, 211 (6th Cir. 1996). Each of these actions balances the privacy interests of the suspects and our concerns for officer safety, "but the Fourth Amendment does not tolerate, nor has the Supreme Court or this Court ever condoned, pat-down searches without some specific and articulable facts to warrant a reasonable officer in the belief that the person detained was armed and dangerous." *Bennett v City of Eastpointe*, 410 F.3d 810, 841 (6th Cir. 2005). In this case, we conclude that Officer Ray lacked sufficient evidence to believe that Noble presented a danger to the safety of the officers or others.[14] Thus, we **REVERSE** the district court's denial of

---

[13]The dissent notes that "in order to search the car, Ray would have had to divert his gaze from Noble at some point, which means that Noble would have had the opportunity to pull a gun on Ray during the search." Dissent at 24. In this case, that risk was dramatically reduced by Detective Hart's presence on the scene. *See supra*, note 10. Moreover, as with the time of day and location of a traffic stop, we fail to see how Officer Ray's backup, or lack thereof, makes Noble more or less likely to be armed.

[14]At the suppression hearing, Officer Ray testified that Noble's nervousness and the DEA drug investigation "made [him] think that there was something going on, that there was something illegal in the car . . . ." R. 50 at 83:2–4 (Suppression Hr'g Tr.) (Page ID #297). The government cites this statement in support of its argument that Officer Ray had reasonable suspicion to believe that Noble was armed and dangerous. *See* Appellee Br. at 23. However, Officer Ray and the government have confused the scope of a frisk, the scope of a search, and the justifications and requirements for each. A police officer may frisk a suspect *only if* there is reasonable suspicion to believe that the suspect is armed and dangerous. *Bennett v. City of Eastpointe*, 410 F.3d 810, 835 (6th Cir. 2005) (citing *Terry*, 391 U.S. at 27). "A reasonable belief that the suspect has contraband is not sufficient." *Id.* (citing *Sibron*, 392 U.S. at 63–65). In order to search a suspect's person for contraband, a police officer—in most cases—must have a search warrant based upon probable cause. *United States v. McLevain*, 310 F.3d 434, 438 (6th Cir. 2002). The upshot of all of this is that whether Officer Ray believed Noble had drugs on his person is entirely

Noble's motion to suppress, **VACATE** his conviction, and **REMAND** for proceedings consistent with this opinion.

## D. Standing of Adkins and Brooks

Having concluded that Officer Ray lacked reasonable suspicion to frisk Noble and that, therefore, Noble's motion to suppress should have been granted, we must address how our decision affects Adkins and Brooks, as they both adopted Noble's motion to suppress. In doing so, we must confront an awkward problem, as Adkins and Brooks have not explained how the frisk of Noble impacts their Fourth Amendment rights.

It is long-settled that "Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." *Alderman v. United States*, 394 U.S. 165, 174 (1969) (citations omitted); *see also United States v. Salvucci*, 448 U.S. 83, 85 (1980) (overruling "automatic standing" doctrine); *Rakas v. Illinois*, 439 U.S. 128, 133–34 (1978) (reaffirming *Alderman*); *Wong Sun v. United States*, 371 U.S. 471, 491–92 (1963) (holding that evidence taken in violation of one defendant's Fourth Amendment rights, and thus inadmissible against him, was nonetheless admissible against a co-defendant, whose rights had not been violated). As a result, a defendant seeking to suppress evidence "must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable . . . ." *Minnesota v. Carter*, 525 U.S. 83, 88 (1998). Somewhat confusingly, the Supreme Court refers to this burden as Fourth Amendment standing. This type of standing, however, is not jurisdictional nor rooted in Article III, but "is more properly subsumed under substantive Fourth Amendment doctrine." *Rakas*, 439 U.S. at 139. In other words, for a defendant to argue successfully that evidence should be suppressed, he must show, as an element of his claim, that the government infringed upon his Fourth Amendment rights.

In this case, "we are at a loss to understand why the government did not contest [Adkins's and Brooks's] standing to challenge [Officer Ray's frisk of Noble]." *United States v. Price*, 54 F.3d 342, 345 (7th Cir. 1995). We have clearly stated that drivers "lack[] standing to

---

irrelevant to whether Officer Ray was justified in frisking Noble. Therefore, statements related to suspicion of drug possession—such as Officer Ray's—are not considered in our reasonable-suspicion analysis.

challenge the personal search of the passengers in [their] car[s] or the admissibility of the [contraband] found on them." *United States v. Myers*, 102 F.3d 227, 231 (6th Cir. 1996). Moreover, the Supreme Court has held that participants in a criminal conspiracy have no reasonable expectation of privacy in their co-conspirators' persons. *United States v. Padilla*, 508 U.S. 77, 82 (1993). Thus, it appears that Adkins and Brooks lack standing to challenge Officer Ray's patdown of Noble.

The government, however, failed to make this argument in the district court or in its opening brief before us. For its part and to its credit, the government has informed us that "the United States waived the non-jurisdictional issue [of Fourth Amendment standing] by failing to raise the issue in its initial brief." Letter from Charles P. Wisdom, Jr., Appellate Chief, to Deborah S. Hunt, Clerk of Court, at 1 (June 26, 2014). The government is correct, as noted above, that Fourth Amendment standing is a non-jurisdictional issue, *see Steagald v. United States*, 451 U.S. 204, 209 (1981), but we have never fully addressed, and our sister circuits are split over, how to handle the government's professed waiver given that the consequence of this failure is the suppression of evidence against a defendant whose rights were not infringed.

The First and Eighth Circuits appear to hold that the government cannot waive the issue of Fourth Amendment standing. *See United States v. Rodriguez-Arreola*, 270 F.3d 611, 617 (8th Cir. 2001) ("The government cannot waive [the defendant's] lack of standing . . . ."); *United States v. Bouffard*, 917 F.2d 673, 677 (1st Cir. 1990) (remanding for further fact-finding when the government conceded a defendant's standing in district court). We have implicitly rejected this approach before. *See United States v. Dyer*, 580 F.3d 386, 390 (6th Cir. 2009) ("[T]he government has not appealed the district court's determination that standing existed and has thus waived the issue."); *United States v. Washington*, 380 F.3d 236, 240 n.3 (6th Cir. 2004). ("The government failed to raise this [standing] issue on appeal, and has therefore waived it."). We explicitly do so now. The First and Eighth Circuits' approach is, in our view, misguided. As the Supreme Court has made clear, Fourth Amendment standing is akin to an element of a claim and does not sound in Article III. *See, e.g.*, *Rakas*, 439 U.S. at 139. The government, like other litigants, therefore, can forfeit or waive an argument that defendants lack Fourth Amendment standing. *See Steagald*, 451 U.S. at 209 ("[T]he Government was initially entitled to defend

against petitioner's charge of an unlawful search by asserting that petitioner lacked a reasonable expectation of privacy in the searched home . . . .  The Government, however, may lose its right to raise factual issues of this sort before this Court . . . when it has failed to raise such questions in a timely fashion during the litigation.").  Accordingly, we now affirmatively hold that the government can forfeit and waive any objections to a defendant's Fourth Amendment standing.

In concluding that the government may forfeit or waive its objection, we join the majority of circuits to have considered this issue.  *See, e.g.*, *United States v. Golson*, 743 F.3d 44, 55 n.9 (3d Cir. 2014); *United States v. Lightbourn*, 357 F. App'x 259, 264 (11th Cir. 2009); *United States v. Paopao*, 469 F.3d 760, 764 (9th Cir. 2006); *United States v. Gonzales*, 79 F.3d 413, 419 (5th Cir. 1996); *Price*, 54 F.3d at 345–46 (7th Cir.); *United States v. Dewitt*, 946 F.2d 1497, 1499–1500 (10th Cir. 1991).  But this group, itself, is divided on how to treat the government's failure to raise the standing argument.

One approach, typified by the Third Circuit, holds that the government's failure to argue the standing issue before the district court represents a waiver that fully extinguishes the argument, even if the government catches its error on appeal.  *See Golson*, 743 F.3d at 55 n.9; *United States v. Butler*, 405 F. App'x 652, 654 (3d Cir. 2010); *United States v. Stearn*, 597 F.3d 540, 551–52 n.11 (3d Cir. 2010).  For support, the Third Circuit relies upon "the ordinary rule [for appellate courts] that an argument not raised in the district court is waived on appeal." *Stearn*, 597 F.3d at 551–52 n.11.  The other approach, represented by the Ninth Circuit, gives the government a second bite at the apple and allows it to "argue for the first time on appeal that [a defendant] lacks standing to challenge [a search or seizure]." *United States v. Paopao*, 469 F.3d at 764 (citing *United States v. Taketa*, 923 F.2d 665, 670 (9th Cir. 1991)).  The Ninth Circuit reasons that when a defendant appeals the denial of a motion to suppress, "he carries the burden to show that the District Court was in error." *Id.*  As a result, the defendant continues to bear the burden of showing that he has standing, and absent reliance, the government—as the party without the burden of persuasion—can raise the standing issue on appeal.  The Ninth Circuit, however, will also treat the government's failure to raise the standing issue in its opening appellate brief as waiver. *See United States v. Ewing*, 638 F.3d 1226, 1230 (9th Cir. 2011).

In discussing this issue, courts have used the terms "forfeiture" and "waiver" rather loosely. *See, e.g., Gonzales*, 79 F.3d at 419 (waiver); *United States v. Amuny*, 767 F.2d 1113, 1122 (5th Cir. 1985) (forfeiture). These terms have different meanings and different consequences, *see United States v. Olano*, 507 U.S. 725, 733 (1993); Fed. R. Crim. P. 52, and we hesitate to confuse or conflate them, *see Kontrick v. Ryan*, 540 U.S. 443, 458 n.13 (2004) (noting the unfortunate fact that "jurists often use the words interchangeably"). "[F]orfeiture is the failure to make the timely assertion of a right[;] waiver is the 'intentional relinquishment or abandonment of a known right.'" *Olano*, 507 U.S. at 733 (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)) (second alteration in original). When a criminal defendant forfeits a right by failing to assert it in a timely manner, we can review it only if there was a plain error that affects his or her "substantial rights." Fed. R. Crim. P. 52(b). In contrast, waiver extinguishes the ability to challenge any error under Rule 52. *Olano*, 507 U.S. at 733; *see also United States v. Moore*, 93 F. App'x 887, 891 n.6 (6th Cir. 2004).

Under *Olano*, the government's failure to argue in the district court that Adkins or Brooks lacked standing to challenge the frisk of Noble is a forfeiture, *see* 507 U.S. at 733, and we may "exercise [our] discretion to correct a plain forfeited error that affects substantial rights . . . if the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings," *United States v. Barajas-Nunez*, 91 F.3d 826, 830 (6th Cir. 1996) (internal quotation marks omitted; brackets in original). Accordingly, we would allow the government to raise an objection to a defendant's Fourth Amendment standing for the first time on appeal, provided that the government can show that the defendant plainly lacked standing and that our failure to recognize it would "seriously affect[] the fairness, integrity or public reputation of judicial proceedings." *Id.* However, if the government fails to raise the issue in its opening brief on appeal, then the objection is waived. *See United States v. Ford*, 184 F.3d 566, 578 n.3 (6th Cir. 1999) ("Even appellees waive arguments by failing to brief them."); Fed. R. App. P. 28(b). This case, as the government recognizes, falls within the latter category, and thus, we hold that the government has waived any objection to Adkins's or Brooks's Fourth Amendment standing. Therefore, we **REVERSE** the district court's denial of their motions to suppress, **VACATE** their convictions, and **REMAND** for proceedings consistent with this opinion.

## IV.  CONCLUSION

In summary, Officer Ray did not impermissibly extend the scope or the duration of the initial traffic stop by performing a field-sobriety test upon Adkins or asking for consent to search the Tahoe.  Considering the totality of the circumstances, however, we hold that Officer Ray lacked reasonable suspicion to frisk Noble.  As a result, we **REVERSE** the district court's denial of Noble's motion to suppress, **VACATE** his conviction, and **REMAND** for proceedings consistent with this opinion.  Adkins and Brooks joined Noble's motion to suppress, but it appears from the record that they plainly lack standing to challenge the frisk of Noble.  Nonetheless, the government forfeited its right to challenge their standing by failing to raise the issue in district court, implicitly waived that right by failing to assert that argument in its opening brief, and explicitly waived its right to object in a post-argument letter to us.  Therefore, we may not consider Adkins's and Brooks's lack of standing and must **REVERSE** the district court's denial of their motions to suppress, **VACATE** their convictions, and **REMAND** for proceedings consistent with this opinion.

---

**DISSENT**

---

KETHLEDGE, Circuit Judge, dissenting.  Police officers are "entitled to rely on their experience and training in concluding that weapons are frequently used in drug transactions, and to take reasonable measures to protect themselves." *United States v. Jacob*, 377 F.3d 573, 579 (6th Cir. 2004) (internal quotation marks omitted).  Here, Officer Ray obtained valid consent from Adkins to search the Tahoe, a car that Ray knew was the subject of a drug-trafficking investigation.  But Ray first had to decide what to do with Noble, an unusually nervous passenger sitting inside.

In my view, Ray reasonably ordered Noble out of the car and frisked him for weapons. There was an appreciable risk that Noble was involved in drug trafficking and, consequently, that he was carrying a weapon.  Noble's extreme nervousness only heightened the danger to Ray. Moreover, in order to search the car, Ray would have had to divert his gaze from Noble at some point, which means that Noble would have had the opportunity to pull a gun on Ray during the search.  I do not believe the Fourth Amendment required Ray to take that risk in order to execute a lawful search.  The reasonable course of action, which Ray took, was first to frisk Noble to make sure he did not have a gun.  That said, the question is close, and our precedents do not compel an answer one way or the other.  But the touchstone of the Fourth Amendment is reasonableness; and by that measure, Ray's frisk of Noble was lawful.

I respectfully dissent.