RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 16a0265p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

> *Plaintiff-Appellee,*

*v.*

No. 16-3376

JOSE A. PACHECO,

> *Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:14-cr-00258—James L. Graham, District Judge.

Decided and Filed:  October 28, 2016

Before:  DAUGHTREY, GIBBONS, and COOK, Circuit Judges.

_____

## COUNSEL

**ON BRIEF:**  Frederick D. Benton, Jr., FREDERICK D. BENTON, JR., LPA, Columbus, Ohio, for Appellant.  Peter K. Glenn-Applegate, UNITED STATES ATTORNEY'S OFFICE, Columbus, Ohio, for Appellee.

_____

## OPINION

_____

JULIA SMITH GIBBONS, Circuit Judge.  Defendant-appellant Jose Pacheco appeals the district court's denial of his motion to suppress evidence discovered during a *Terry* stop and subsequent pat-down search.  During this precautionary pat down for weapons, an officer discovered that Pacheco had over $3,000 in currency and a half-kilogram of brick cocaine in his cargo shorts.  The district court found that, based on the totality of the circumstances, the officer

had reasonable suspicion to justify the pat down of Pacheco for weapons, and that the cocaine and currency were properly seized pursuant to the plain-view and plain-feel doctrines.

Because the *Terry* stop, the removal of Pacheco from the vehicle, the pat down, and the seizure of contraband and currency were all within the bounds of the Fourth Amendment, we affirm the district court's decision.

I.

On the evening of December 10, 2010, Detective William Best received a call from Sergeant Jeff Lipp, informing him that a confidential source had information about "subjects moving medium to large quantity narcotics in and around the Kimberly Parkway area" of Columbus, Ohio. Best was intimately familiar with this part of town. He testified that "[l]ike most neighborhoods, you have 5 percent of people that cause problems," but noted that the area was prone to "a lot of gang activity." (DE 69, Tr. of Mot. to Supp. Hearing, Page ID 238.)

The source feared retaliation for sharing information but agreed to meet Best in-person. The two met in a parking lot at the corner of Kimberly Parkway and South Hamilton Road. There, the source informed Best that two Hispanic men in a silver Lincoln Aviator were moving narcotics from the Chatham Village apartment complex in the Kimberly Parkway area.

After receiving this information, Best set up surveillance in an unmarked car. In order to gain a strategic view of the Chatham Village apartments, which are on the north side of Kimberly Parkway, Best stationed himself in a parking lot on the south side of the parkway. The source told Best only that the subjects would be moving the narcotics "in the evening," and he was unsure of precisely when to expect them. (*Id*. at 233.) Best had never met this source and did not know his accuracy, reliability, or credibility. However, within forty-five minutes, Best saw a silver SUV exit Chatham Village.

Best was unsure if this was his target vehicle but decided to attempt to verify that it was. The silver SUV was traveling eastbound on Kimberly Parkway, and Best pulled out and positioned himself behind it. Best could now see that this vehicle was a silver Lincoln Aviator that precisely matched the description given by the informant, but he still needed to verify

whether the occupants of the vehicle potentially matched the source's description. Best and the Aviator stopped at the well-lit corner of Kimberly Parkway and South Hamilton Road. The target vehicle was in the far left of two left-turn lanes. Best pulled up along the passenger-side of the Aviator and observed what he believed were two Hispanic males in the vehicle.

Now that "everything started adding up," just as the source had stated it would, Best called Officer Jeremy Phalen, a patrol officer he knew worked in the area. (*Id*. at 235, 237.) As the Aviator was turning, Best had witnessed the driver fail to properly signal a turn, and he relayed this information, and information about his narcotics tip, to Phalen and his partner, Officer Kenneth Trivette.

Best dropped back and allowed Phalen and Trivette to move in behind the Aviator in their patrol car. Phalen was also very familiar with the Kimberly Parkway area and stated that it was a "hotbed for gang activity." (*Id*. at 256.) With this in mind, he and Trivette followed the Aviator until they saw it unexpectedly swerve across the double-yellow lines. Phalen turned on his emergency lights and the Aviator pulled to the side of the road, ultimately coming to a stop in a gas-station parking lot.

Phalen and Trivette exited their patrol car and approached the Aviator. Phalen approached the driver's side of the vehicle, while Trivette took the passenger's side. Phalen spoke with the driver, later identified as Mario Calderon, and discovered that he had no valid driver's license. He also observed Calderon visibly shaking while he spoke with him and decided to remove him from the Aviator. He proceeded to pat down Calderon and place him in the back of the police cruiser so that he could aid Trivette.

As Phalen had approached the driver's side of the vehicle, Trivette had done the same on the passenger's side, where Pacheco was sitting. Trivette noted that Pacheco was not wearing his seatbelt. Trivette asked Pacheco for identification, but Pacheco did not respond. Instead, Pacheco began rummaging through the glove compartment, ruffling papers but removing nothing. Trivette testified that Pacheco was extremely nervous, and was glancing around the vehicle. Pacheco again opened the glove compartment and looked down at the floorboard and over at his left leg, near the center console. All of this concerned Trivette, who testified that the

glove box, the floorboard, and the area between the seat and center console are all often used to conceal weapons. Trivette was also disturbed by Pacheco's "fidgeting around," lack of eye contact, and his failure to acknowledge any of Trivette's questions. (*Id.* at 271.) Considering all of these factors, Trivette testified that "something wasn't right." (*Id.*) Trivette then asked Pacheco to exit the vehicle. Pacheco did not respond or comply with this order. Trivette asked Pacheco to exit again, this time opening the door for him.

Pacheco exited the vehicle, and Trivette initiated a pat down of his person. On Pacheco's right side, Trivette felt "a large chunk of money on his right cargo pocket." (*Id.* at 275.) Trivette then switched his focus to Pacheco's left leg, and immediately noticed the top of a brick-like object, wrapped in brown paper and tape, protruding approximately one inch out of the top of Pacheco's left cargo pocket. As Trivette patted this area down, he could feel that the object in that cargo pocket was "like a solid brick," and was approximately six-to-eight inches long. (*Id.* at 275, 288.) Based on these observations, and his experience working with narcotics, Trivette recognized, "within seconds," that the object was very likely brick cocaine. (*Id.* at 277, 288.) Trivette seized the contraband and currency, and Pacheco was detained and placed in the rear of the cruiser with Calderon.

## II.

Pacheco was charged with violating 21 U.S.C. §§ 841(a), 846 by possessing with intent to distribute, and conspiring with others with intent to distribute, 494 grams of cocaine. Pacheco filed a motion to suppress the cocaine and currency discovered on his person, claiming that Trivette's pat down violated his Fourth Amendment rights prohibiting unreasonable searches and seizures. Specifically, Pacheco claimed Trivette lacked the requisite "reasonable suspicion" to justify the pat-down search, and accordingly, discovery of the cocaine and currency should be suppressed. The district court held a hearing at which Best, Phalen, and Trivette testified. After the hearing, the district court issued a memorandum opinion and order, denying Pacheco's motion to suppress. In its order, the district court found that, considering the totality of the circumstances, Trivette had reasonable suspicion that Pacheco was armed and dangerous, justifying the pat-down search, and that the seizure of contraband and currency was reasonable.

In support of its finding, the district court listed ten factors that it found supported a finding of reasonable suspicion:

> (1) Detective Best relayed information about a tip that two Hispanic males driving a Lincoln Aviator were involved in cocaine distribution; (2) Mr. Pacheco appeared nervous in the car; (3) Mr. Pacheco looked back and forth to avoid eye contact with Officer Trivette; (4) Mr. Pacheco avoided conversation with Officer Trivette; (5) Mr. Pacheco disregarded Officer Trivette's commands to exit his vehicle; (6) Mr. Pacheco shuffled through the glove box, making furtive gestures; (7) Mr. Pacheco looked down to the floorboard under his seat; (8) Officer Trivette could not identify Mr. Pacheco; (9) the stop occurred at night when it was dark; and (10) the stop occurred in a high crime area.

(DE 40, Op. & Order, Page ID 143–145.)   The district court then proceeded to find that the seizure of contraband and currency was not overly intrusive, relying on the plain-view and plain-feel doctrines as applicable to contraband seized during pat-down searches.

After his motion to suppress was denied, Pacheco entered into a conditional plea agreement in which he reserved his right to appeal the district court's denial of his motion to suppress.  Pacheco then filed this timely appeal.

III.

When reviewing a denial of a motion to suppress, the district court's factual determinations are reviewed for clear error and its legal conclusions are reviewed *de novo*. *United States v. Herndon*, 501 F.3d 683, 687 (6th Cir. 2007) (citing *United States v. Ostrander*, 411 F.3d 684, 694 (6th Cir. 2005)).  "Whether an officer had reasonable suspicion under the circumstances to frisk a suspect is a mixed question of law and fact that we review de novo." *United States v. Noble*, 762 F.3d 509, 519 (6th Cir. 2014) (quoting *United States v. Stepp*, 680 F.3d 651, 660 (6th Cir. 2012)).  Likewise, any probable-cause determination is reviewed *de novo*.  *United States v. Martin*, 526 F.3d 926, 936 (6th Cir. 2008).  However, the evidence must be viewed in a light most likely to support the district court's decision.  *Id.*  (citing *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005)).

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures."  U.S. Const. amend. IV.  When a motorist is

stopped by the police, he, and all of his passengers, are "seized" within the meaning of the Fourth Amendment.[1] *Brendlin v. California*, 551 U.S. 249, 256–59 (2007). A police officer may stop a motorist when he possesses probable cause of a civil infraction or has reasonable suspicion of criminal activity. *United States v. Lyons*, 687 F.3d 754, 763 (6th Cir. 2012); *see also Noble*, 762 F.3d at 518 (citing *Lyons* for the same). Here, Phalen and Trivette not only received information about Calderon failing to signal his turn, but also witnessed the vehicle swerve over the double-yellow line. Although Pacheco does not outright challenge the traffic stop, he suggests throughout his briefing that the officers' true motive for stopping the vehicle was "to pursue a narcotics investigation." (R. 12, Appellant Br. at 8.) However, "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Whren v. United States*, 517 U.S. 806, 813 (1996). Thus, the two traffic infractions justified Phalen and Trivette in stopping the Aviator.

It also is well-established that, during a traffic stop, an officer may order passengers out of the vehicle pending the completion of the stop. *Maryland v. Wilson*, 519 U.S. 408, 414–15 (1997). The officers do not need independent justification to remove the driver or passengers from the vehicle. *Id.* at 413 & n.1. This is so, in large part, because traffic stops are "fraught with danger" for police officers. *Michigan v. Long*, 463 U.S. 1032, 1047 (1983). Thus, after permissibly stopping the Aviator for prior traffic violations, Phalen and Trivette were permitted to remove Calderon and Pacheco from the SUV.

This leaves two actions to review: the pat-down search of Pacheco and the seizure of the cocaine and currency found on his person pursuant to that search.

## A.

When an officer makes a *Terry* stop, he may also perform a precautionary search—known as a "frisk" or "pat down"—whenever he has "reasonable suspicion" that the person searched may be armed and dangerous. *Knowles v. Iowa*, 525 U.S. 113, 118 (1998). "Reasonable suspicion is based on the totality of the circumstances." *Joshua v. DeWitt*, 341 F.3d

---

[1]Due to their usually brief nature, traffic stops are more akin to the so-called "*Terry*" stop than a full-blown arrest. *See United States v. Noble*, 762 F.3d 509, 519 (6th Cir. 2014) (citing *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984)). Accordingly, the traffic stop in this case will also be referred to as a *Terry* stop.

430, 443 (6th Cir. 2003).   Ultimately, the test is whether "a reasonably prudent [person] in the circumstances would be warranted in the belief that his [or her] safety or that of others was in danger." *Noble*, 762 F.3d at 521–22 (alteration in original) (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968)).

"Reasonable suspicion" is recognized for being an abstract concept, but this is a product of design, not accident or error, and the Supreme Court has "deliberately avoided reducing it to 'a neat set of legal rules.'" *United States v. Arvizu*, 534 U.S. 266, 274 (2002) (quoting *Ornelas v. United States*, 517 U.S. 690, 695–96 (1996)); *see also Illinois v. Gates*, 462 U.S. 213, 232 (1983) (noting that "probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules"). With this abstract, context-specific framework in mind, the Supreme Court has also cautioned reviewing courts not to consider factors in the reasonable-suspicion analysis in isolation from one other. *Arvizu*, 534 U.S. at 274.   A "divide-and-conquer" analysis—where each factor is singled out and the court engages in a post-hoc search for an innocent explanation—is not permitted.   *Id.*   And, while the Supreme Court has wrestled with the precedential difficulties created by this fact-specific approach, it has suggested that "[e]ven if in many instances the factual 'mosaic' analyzed for a reasonable-suspicion determination would preclude one case from squarely controlling another, 'two decisions when viewed together may usefully add to the body of law on the subject.'" *Id*. at 275 (quoting *Ornelas*, 517 U.S. at 697–98).

This case and *Noble* are two such decisions.   In *Noble*, we reversed a district court's denial of a motion to suppress, finding that the officer did not have reasonable suspicion to perform a pat-down search of the defendant.   762 F.3d at 525–26.   A review of the facts of that case demonstrates why affirming the district court's denial of Pacheco's motion to suppress is appropriate here.

In fall of 2012, law-enforcement officials were investigating a methamphetamine-distribution network in Eastern Kentucky.   *Id.* at 514.   Officers received a tip that two individuals—Brooks and Adkins—were picking up contraband in Louisville and routing it through Lexington and into various counties in Eastern Kentucky.   *Id*.   Initially, the informant told the officers to be on the lookout for a white Jeep Cherokee, but, after failing to find that

vehicle, the informant stated that the target vehicle might be a "dark-colored Chevrolet Tahoe" instead.  *Id*.  Officers eventually spotted a vehicle matching that description, and, after witnessing the Tahoe cross from the center lane into the right lane without using a signal, and noticing that its windows were most likely illegally tinted, they pulled it over.  *Id*. at 514–15.  An officer approached the vehicle from the passenger side, and upon confronting the passenger there, noted that the passenger, later identified as Noble, was extremely nervous.  *Id*. at 515. After talking with Noble, the officer returned to the cruiser, tested the window tint of the Tahoe, and assisted his partner in administering a field-sobriety test on the driver.  *Id*. at 515–16.  The officer eventually ordered Noble out of the Tahoe and performed a pat-down search of his person for weapons.  *Id*. at 516.  The grounds for this pat down were Noble's nervousness and that Noble was in a car suspected of being involved with narcotics trafficking.  *Id*.  Additionally, the officer knew from his training and experience that those who deal in narcotics often carry weapons to protect themselves.  *Id*.  During the pat down, the officer discovered contraband and a handgun on Noble's person.  *Id*.

We found that the three grounds mentioned above were insufficient to create a reasonable suspicion that Noble was armed and dangerous.  *Id*. at 525.  Specifically, we were critical of nervousness as an indicator of dangerousness, noting that, because many law-abiding citizens are nervous during traffic stops, it is unreliable.  *Id*. at 522–23.  We found that Noble's nervousness should be discounted because, after witnessing his alleged nervousness, the officer returned to his cruiser, inspected the window tint, and performed a field-sobriety test on the driver, and then performed the pat down on Noble.  *Id*. at 523.  These actions, we concluded, reflected a lack of suspicion as to a suspect's dangerousness, which an officer needs in order to justify a pat down for weapons. We also noted that mere presence in a vehicle suspected of trafficking in narcotics is not "an automatic green light" for frisking that person.  *Id*. at 523.  Instead, the officer must be able to give specific, articulable reasons for believing that a particular person is dangerous before he or she may frisk the suspect.  *Id.* (citing *United States v. Cortez*, 449 U.S. 411, 417 (1981)). And, while the *Noble* court acknowledged that drug dealers are frequently armed, it also noted that we have always required some corroboration that particular individuals are involved in drug trafficking before allowing a frisk for weapons.  *Id*. at 524 (citing *United States v. Branch*, 537 F.3d 582, 589 (6th Cir. 2008)).  The majority also highlighted several important factors that were

missing from *Noble*.  The court noted that there was no testimony that Noble failed to comply with an officer's commands.  *Id*.  Further, Noble did not avoid all eye contact with the officers, fidget with his pockets, or behave as if he was concealing something.  *Id*.  Considering all of these absent factors, we found a lack of reasonable suspicion.  *Id*. at 529.

Importantly, both the majority and the dissent in *Noble* acknowledged that the circumstances there presented a close case.  *Id*. at 522, 529.  Many of the factors missing from *Noble* are present here, and taken together, they nudge this case across the boundary into constitutionally permissible conduct.

The tip in this case was more detailed and further corroborated than that in *Noble*.  This made it more likely that the two men inside the Aviator were engaged in narcotics trafficking, and thus—given the strong association between drug dealing and firearms—more likely that they were potentially armed.  *See Branch*, 537 F.3d at 589 (holding that officers can rely on their training and experience that drug dealers frequently carry weapons); *see also United States v. Jacob*, 377 F.3d 573, 579 (6th Cir. 2004) (holding the same).[2]  In *Noble*, the tipster originally claimed that the target car would be a white Jeep Cherokee.  762 F.3d at 514.  When officers failed to locate such a car, the tip changed, and the source claimed that it might be a dark-colored Tahoe instead.  *Id*.  In addition to changing the make, model, and color of the vehicle, the tip also failed to give law enforcement any indication of how many occupants to expect or how to identify them.  *Id*.  Here, by contrast, the confidential source gave authorities not only the make, model, and color of the vehicle—which turned out to be accurate the first time—but also provided them with the number of occupants to expect, along with their ethnicity.  And, the source provided the location and time of day to expect the vehicle.  This is a more detailed tip than the one provided in *Noble*, which identified only a vehicle connected with narcotics trafficking.  *Noble*, 762 F.3d at 514–15.  Additionally, Officer Best testified that he had never before heard of a Lincoln Aviator, likely because the Aviator was produced only for model years 2003–2005, making it a relatively unusual vehicle.  *See Lincoln Aviator*, Edmunds (2016), www.edmunds.com/lincoln/aviator/.  Thus, the tip was further substantiated when Best was able

---

[2]All three officers involved in this stop testified that, based on their training and experience, they knew that those who traffic narcotics are frequently armed.

to pull up behind the target vehicle and confirm that it was, in fact, a Lincoln Aviator.  The tip was also corroborated, at least in part, when the Aviator contained two occupants, both males that Best believed were Hispanic.

The Supreme Court has declined to hold that reasonable suspicion can never be created by an anonymous tip, and has further held that where "an informant is shown to be right about some things, he is probably right about other facts that he has alleged, including the claim that the object of the tip is engaged in criminal activity."[3]  *Alabama v. White*, 496 U.S. 325, 331–332 (1990) (citing *Gates*, 462 U.S. at 244).  As the night's events unfolded, the source's predictions continued to come true.  Though not dispositive of reasonable suspicion that Pacheco was armed, the informant's corroborated tip adds support to Trivette's decision to perform a pat-down search.

Next, while we have cautioned against relying too heavily on nervousness as indicia of dangerousness, Pacheco's nervousness is another factor in the totality-of-the-circumstances analysis that supports a reasonable-suspicion finding.  *Noble*, 762 F.3d at 522 (citing *United States v. Wilson*, 506 F.3d 488, 495–96 (6th Cir. 1995)).  While "[n]ervous behavior, standing alone, is not enough to justify a *Terry* search," *Wilson*, 506 F.3d at 495–96, nervousness is still relevant to the reasonable-suspicion calculus.  *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (finding that nervous, elusive behavior is a pertinent factor in determining reasonable suspicion).  And we have found reasonable suspicion in other cases based, in part, on the suspect's extraordinary nervousness that increased as the traffic stop progressed.  *Branch*, 537 F.3d at 589.  In *Noble*, there was no testimony that the suspect became increasingly nervous.  762 F.3d at 522–23.  Here, in contrast, Trivette testified that Pacheco was "extremely nervous," and that as the stop progressed, Pacheco began glancing around the vehicle and rummaging through the glove box.  (DE 69, Tr. of Mot. to Supp. Hearing, Page ID 270–273.)

Additionally, Noble did not avoid all eye contact with the officers, fidget with his pockets, or otherwise act as if he was concealing something.  *Noble*, 762 F.3d at 523–24 (citing *United States v. Oliver*, 550 F.3d 734, 738–39 (8th Cir. 2008); 4 Wayne R. LaFave et al., *Search*

---

[3]And here, rather than being an anonymous tip, the information was obtained from an informant whom Lipp knew and whom Best met in person, further supporting its reliability.

*and Seizure: A Treatise on the Fourth Amendment* § 9.6(a) (5th ed. 2013) (text accompanying notes 80–95, collecting behaviors sufficient for a frisk)).  In contrast, Trivette testified that Pacheco "wouldn't even make eye contact with [him]" and that "he was fidgeting around" as he opened up the glove box and shuffled papers back and forth, removing nothing.  (DE 69, Tr. of Mot. to Supp. Hearing, Page ID 271.)  Further, Trivette testified that Pacheco was looking down at the floorboard and over at the area between the console and his seat.  Trivette claimed that, in his experience, this is an area where firearms are often concealed.  He went on to say that Pacheco disregarded his presence and that "it was like he was looking for like an avenue of escape almost." (*Id*. at 273.)  The absence of these factors weighed against reasonable suspicion in *Noble*; their presence weighs in favor here.

Further, Pacheco's failure to acknowledge Trivette's presence and his failure to obey the officer's commands also support a protective pat-down search.  Noble's compliance with all of the officer's commands was an important factor that militated against a finding of reasonable suspicion.  Here, Pacheco did not respond or acknowledge Trivette's command that he exit the vehicle until the request was repeated and Trivette opened the door.  While many of Pacheco's behaviors are now explainable due to his lack of English-language skills, this innocent explanation was unknown to Trivette at the time of the stop.  Additionally, even if Trivette had known that Pacheco did not speak English, the officer testified that, in his experience, non-English speakers attempted to communicate via hand motions or otherwise tried to convey that they did not speak English.  Pacheco, by contrast, completely ignored Trivette.  Reasonable suspicion requires reviewing courts to apply an objective standard, and to answer whether "the facts available to the officer *at the moment* of the seizure or the search warrant a [person] of reasonable caution in the belief that the action taken was appropriate?" *Terry*, 392 U.S. at 21–22 (emphasis added).  In the moment, Trivette did not know that Pacheco's failure to comply with his commands was because Pacheco did not understand English; instead, all he knew was that he had a suspect who was ignoring his commands and avoiding eye contact, all the while exhibiting extremely nervous and concerning behavior.

Finally, the time of day and the nature of the neighborhood also support Trivette's reasonable-suspicion determination.  While "mere presence in a high crime area is insufficient

'to support a reasonable, particularized suspicion that the person is committing a crime,'" it is "'among the relevant contextual considerations in a *Terry* analysis.'" *Hoover v. Walsh*, 682 F.3d 481, 495 (6th Cir. 2012) (quoting *Wardlow*, 528 U.S. at 124). Likewise, time of day "is relevant without being independently dispositive." *Id.* at 495 (citing *United States v. See*, 574 F.3d 309, 314 (6th Cir. 2009)). Here, there was testimony that the area was known for its drug trafficking and gun violence and as a "hotbed" for gang activity. (DE 69, Tr. of Mot. to Supp. Hearing, Page ID 238, 256.) And the stop occurred at night.

When considering all of the abovementioned factors together, the totality of the circumstances supports a finding of reasonable suspicion in this case. In applying the totality-of-the-circumstances test, the Supreme Court has cautioned against separating each factor from the others and finding an innocent explanation for it. This is so because "sometimes behavior giving rise to reasonable suspicion is entirely innocent," and often there may be a "series of acts, each of them perhaps innocent in itself, but which taken together warrant further investigation." *Wardlow*, 528 U.S. at 130 n.4 (Stevens, J., concurring in part and dissenting in part) (citing *Terry*, 392 U.S. at 22–23, 30) (internal citations and quotations omitted). Thus, while many of the factors here, when considered alone, cannot support a reasonable-suspicion determination, their collective weight justified Trivette's pat-down search of Pacheco.

B.

Having found that the pat-down search was supported by reasonable suspicion, we must next determine whether the seizure of the cocaine and currency was reasonable. During a protective pat down, an officer does not need to ignore contraband should any be discovered. *Minnesota v. Dickerson*, 508 U.S. 366, 374 (1993). But "[i]f the protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under *Terry* and its fruits will be suppressed." *Id.* at 373 (citing *Sibron v. New York*, 392 U.S. 40, 65–66 (1968)). Employing the plain-view and plain-feel doctrines, the Supreme Court has held that three elements must be met for contraband to be seized during a *Terry* pat down: (1) the police must be in a lawful position from which they view (or feel) the object; (2) the object's incriminating nature must be immediately apparent; and (3) the officers must have a lawful right of access to the object. *Id.* at 375 (extending the plain-view doctrine to include discoveries of contraband via

the sense of touch).  Because the *Terry* stop, removal of Pacheco from the car, and the pat-down search of his person were all constitutionally permissible, Trivette was in a lawful position to both view the contraband and feel it during the pat-down, and he also had a lawful right of access to it.[4]  Thus, all that remains to be determined is whether the brick's incriminating nature was immediately apparent.

The requirement that the incriminating nature of seized items be immediately apparent was "very likely an unhappy choice of words, since it can be taken to imply that an unduly high degree of certainty as to the incriminatory character of evidence is necessary for an application of the 'plain view' doctrine." *Texas v. Brown*, 460 U.S. 730, 741 (1983).  That said, that the incriminating nature of the evidence be immediately apparent "is necessary to prevent officers from using the plain view doctrine as a means to extend a particularized search authorized by Fourth Amendment principles into an unlawful exploratory search." *United States v. Garcia*, 496 F.3d 495, 510 (6th Cir. 2007) (citing *Horton v. California*, 496 U.S. 128, 136–37 (1990)).  In assessing whether an object's incriminatory nature is immediately apparent, the court must "look to three factors, none of which is necessary but each of which is instructive." *Id*.  These factors are:

> (1) a nexus between the seized object and the [suspected criminal activity]; (2) whether the intrinsic nature or appearance of the seized object gives probable cause to believe that it is associated with criminal activity; and (3) whether the executing officers can at the time of discovery of the object on the facts then available to them determine probable cause of the object's incriminating nature.

*Id*. (quotations and citations omitted); *see also United States v. Chandler*, 437 F. App'x 420, 427–28 (6th Cir. 2011).

Here, there was a strong nexus between the suspected narcotics trafficking and the cocaine and currency seized.  Trivette testified that he "felt a large chunk of money" in Pacheco's right cargo pocket.  (DE 69, Tr. of Mot. to Supp. Hearing, Page ID 275.)  After removing the currency, Trivette moved to Pacheco's left side, where he noticed a brick-like object protruding approximately one inch out of that cargo pocket.  He observed that it was

---

[4]We note that Trivette discovered the contraband before his pat-down search of Pacheco was completed, and thus, while he still had a lawful right of access to Pacheco's person. *Dickerson*, 508 U.S. at 373.

wrapped in brown paper and bound together with tape.  Based on his training and experience, this was consistent with how brick cocaine is packaged.  Further, when he patted down the pocket, he discovered that the brick was solid and around six-to-eight inches long.  As Trivette began to pat down the pocket, Pacheco muttered that the brick was "tortillas," a fact that seemed unlikely to Trivette and furthered his suspicion that the object was contraband.  (*Id*. at 276.)  Combining his sight and his touch with his training and experience, Trivette concluded "within seconds" that this object was probably brick cocaine.[5]  (*Id*. at 277.)  "[A] reviewing court should be duly mindful of the executing officers' particular, subjective training and experiences." *United States v. Szymkowiak*, 727 F.2d 95, 98 (6th Cir. 1984) (citing *Brown*, 460 U.S. at 745 (Powell, J., concurring)).  Here, the district court credited Trivette's testimony that, in his training and experience, the packaging of the object, coupled with its size and feel, was consistent with that of brick cocaine.  It was not clearly erroneous to do so.  *See Arvizu*, 534 U.S. at 276–77 (noting that "due weight" should have been given to the district court's factual inferences due to its "superior access to the evidence and the well-recognized inability of reviewing courts to reconstruct what happened in the courtroom"); *see also Herndon*, 501 F.3d at 687 (holding that factual determinations are reviewed for clear error).

This case is similar to *Texas v. Brown*, in which the Supreme Court upheld the seizure of an uninflated balloon pursuant to the plain-view doctrine.  460 U.S. at 743–44.  In his concurrence, Justice Powell noted that "[e]ven if it were not generally known that a balloon is a common container for carrying illegal narcotics, we have recognized that a law enforcement officer may rely on his training and experience to draw inferences and make deductions that might well elude an untrained person." *Id*. at 745 (Powell J., concurring) (citing *Cortez*, 449 U.S. at 418).  And the majority in *Brown* reminded reviewing courts that "probable cause is a flexible, common-sense standard" that merely requires that "the facts available to the officer would warrant a man of reasonable caution in the belief that certain items may be contraband . . .

---

[5]Trivette's testimony that "within seconds" he realized that the packaging was likely brick cocaine, while not literally instantaneous, does not undermine a finding that that the brick's criminal nature was immediately apparent to him.  This court has held that an object's "incriminating nature is not immediately apparent if it appears suspicious to an officer but further investigation is required to establish probable cause as to its association with criminal activity." *Garcia*, 496 F.3d at 510–11 (quoting *Shamaeizadeh v. Cunigan*, 338 F.3d 535, 555 (6th Cir. 2003)).  Here, the packaging and feel of the object, combined with all other facts known to Trivette, was sufficient to create probable cause with no further investigation.

or useful as evidence of a crime." *Id*. at 742 (internal quotations and citations omitted). "[I]t does not demand any showing that such a belief be correct or more likely true than false." *Id*. Here, a reasonably cautious person, viewing the facts as they were to Trivette, would have been warranted in the belief that the brick-like object in Pacheco's pocket was contraband. The seizure of the brick cocaine and currency did not offend the Fourth Amendment as it was reasonable and within the bounds of *Terry* and its progeny.

IV.

For these reasons, we affirm the district court's denial of the motion to suppress.