NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0225n.06

Case No. 20-1483

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED

Apr 27, 2021
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| GEONTAY PATTERSON, | ) | DISTRICT OF MICHIGAN |
| Defendant-Appellant. | ) | |
| | ) | **O P I N I O N** |

BEFORE: KETHLEDGE, STRANCH, and BUSH, Circuit Judges.

JOHN K. BUSH, Circuit Judge. Geontay Patterson appeals his judgment of conviction for illegal drug possession with intent to distribute. He challenges the district court's denial of his two motions to suppress and his motion for reconsideration. Specifically, he argues that the state troopers who discovered the drugs did not have a reasonable basis to prolong their traffic stop, or to detain and frisk him. We find no error in the district court's holding to the contrary, and therefore we affirm.

I.

The traffic stop giving rise to this prosecution occurred in Muskegon Heights, Michigan, just after 11 PM on February 22, 2019. Michigan State Police Troopers Kyle Sandford and David Burr were on patrol when they observed a vehicle driving east with a defective license plate light and a faulty brake light. Sandford turned on his emergency lights to initiate a traffic stop, but the

targeted vehicle did not immediately pull over. Instead, it slowly merged north onto another road and traveled at five to ten miles per hour for about a quarter mile. Eventually the vehicle came to a halt, and both troopers quickly exited their patrol car to question the occupants, one of whom was Patterson.

We will discuss more details of the traffic stop when we address Patterson's legal arguments below. Suffice it for now to say that all of the vehicle's occupants, including Patterson, were ordered out of the car and frisked. When Sandford patted down Patterson's pockets, he felt a hard substance, the size of a baseball, wrapped in a plastic bag. The trooper thought it was packaged narcotics. So, he pulled it out, and it was in fact drugs (54 grams of crystal meth, to be exact). Sandford then initiated a search incident to arrest, during which he found another bag containing 2 more grams of crystal meth, in addition to 2.5 grams of fentanyl, and 4.6 grams of cocaine base.

Patterson was charged with one count of possession with intent to distribute each of those drugs. Patterson moved to suppress the drugs found in his pockets. The district court conducted a hearing, but ultimately it denied the motion. Believing that the district court committed a factual error, Patterson moved for reconsideration. He also filed a second motion to suppress. The court held another hearing and denied both motions. A week later, Patterson pleaded guilty to the one-count indictment, but he reserved his right to appeal the district court's denial of his motions to suppress and his motion for reconsideration. The court sentenced him to 120 months' imprisonment. Shortly after sentencing, Patterson exercised his right to appeal.

II.

"When reviewing a district court's ruling on a motion to suppress, we review its factual findings for clear error and its legal conclusions de novo." *United States v. Ruffin*, 979 F.3d 528,

531 (6th Cir. 2020). We also review de novo mixed questions of law and fact, like whether an officer has reasonable suspicion to conduct a limited frisk. *United States v. Pacheco*, 841 F.3d 384, 389 (6th Cir. 2016). Where, as here, the district court denied the motion to suppress, we view the evidence in the light most favorable to the government. *Id.* As to a district court's ruling on a motion for reconsideration, we review only for an abuse of discretion. *United States v. Smith*, 421 F. App'x 572, 574 (6th Cir. 2011).

III.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. When a state trooper makes a traffic stop, the stop constitutes a seizure of the car and all of its occupants, so all occupants may challenge the constitutionality of the stop. *Brendlin v. California,* 551 U.S. 249, 251 (2007). A trooper may conduct a traffic stop only if the trooper "possess[es] either probable cause of a civil infraction or reasonable suspicion of criminal activity." *United States v. Lyons*, 687 F.3d 754, 763 (6th Cir. 2012).

Patterson does not contest that Trooper Sandford had probable cause to stop the vehicle he was in for a traffic violation. Rather, he argues that three aspects of Sandford's conduct during the stop violated the Fourth Amendment. First, he argues that Sandford unlawfully prolonged the stop. Second, he contends that Sandford lacked reasonable suspicion to detain him and conduct a frisk. Third, he claims that during the frisk, Sandford manipulated his pocket in violation of the plain-feel doctrine. We address each of Patterson's arguments in turn.

A. DURATION OF STOP

For purposes of the Fourth Amendment, a traffic stop is considered analogous to what we often refer to as a *Terry* stop—a brief investigatory detention, not a formal arrest. *United States v.*

*Noble*, 762 F.3d 509, 519 (6th Cir. 2014). A traffic stop is thus evaluated according to the principles of temporary detention, as discussed in *Terry v. Ohio*, 392 U.S. 1 (1968) and its progeny. Under those principles, a traffic stop violates the Fourth Amendment "if it is prolonged beyond the time reasonably required" to issue a ticket. *Rodriguez v. United States*, 575 U.S. 348, 354–55 (2015) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). "Once the purpose of a traffic stop is completed, a police officer 'may not further detain the vehicle or its occupants unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention.'" *United States v. Blair*, 524 F.3d 740, 752 (6th Cir. 2008) (quoting *United States v. Perez*, 440 F.3d 363, 370 (6th Cir. 2006)). The question of "prolongation" is a fact-specific inquiry; to answer it, we must consider the "totality of the circumstances surrounding the stop." *United States v. Everett*, 601 F.3d 484, 493–94 (6th Cir. 2010) (quoting *United States v. Turvin*, 517 F.3d 1097, 1101 (9th Cir. 2008)).

The circumstances here establish that the duration of the traffic stop was entirely lawful. It began when Sandford and Burr approached the vehicle and started questioning its occupants. Sandford spoke through the driver-side window with Janice Rone, who was at the steering wheel. The trooper asked for her driver's license, vehicle information, registration, and proof of insurance. He also noticed two other occupants in the car: Patterson, who sat on the front passenger side, and Jamarius Randle, who was behind Patterson in the backseat. Sandford's questioning of Rone lasted about two minutes.

Sandford and Burr then returned to their patrol car to check Rone's vehicle information and paperwork. The troopers sat together for about three minutes discussing the situation. Sandford told Burr that he thought Patterson was acting unusual. According to Sandford, Patterson was very nervous, declined to answer any of his initial inquiries, and never made eye contact or

turned his head.  Unlike Rone and Randle, who spoke and acted more normally, Patterson was "frozen."  The troopers considered having the occupants exit the car but decided to first re-confirm Rone's proof of insurance—Sandford had initially thought Rone's paperwork was in order, but later questioned his recollection of her insurance information.  The troopers then planned to approach the car a second time to confirm Rone's insurance information.  But before doing so, they ran Rone's ID through their record management system.  The system reported that Rone had previous contacts with police in the area, several of which were narcotics related.

None of the actions taken by the troopers to verify information regarding the vehicle and its occupants appear inappropriate, given that, as Patterson concedes, the vehicle stop was lawful at the outset. *See United States v. Collazo*, 818 F.3d 247, 258 (6th Cir. 2016) (noting that an officer does not offend the Fourth Amendment by "inspecting the automobile's registration and proof of insurance").

The troopers then approached the stopped vehicle for the second time.  While Sandford re-examined Rone's proof of insurance, Burr alerted Sandford to an open container of alcohol, which was sitting in the backseat of the vehicle near Randle, partially covered, but nonetheless in plain view.  Under Michigan law, it is a misdemeanor for a driver or passenger to transport or possess alcohol in an open container within a vehicle.  Mich. Comp. Laws § 257.624a.  At that point then, Sandford certainly had reasonable suspicion to justify further detention of the vehicle, and all those inside.  For there is reasonable suspicion to make an investigatory stop if an ongoing crime—felony or misdemeanor—is involved. *See Blair*, 524 F.3d at 748.

At Burr's request, Randle got out of the car, and Burr frisked him.  Burr found hydrocodone pills and two rounds of .380 ammunition and quickly notified Sandford.  Sandford then asked Rone

to step out of the vehicle, visually examined her to confirm she was not carrying a weapon, and then proceeded to the other side of the vehicle to direct Patterson to step out to be frisked.

The orders for Patterson and the other occupants to exit the car were entirely permissible. *See Pacheco*, 841 F.3d at 390 ("[I]t is also well-established that, during a traffic stop, an officer may order passengers out of the vehicle pending the completion of the stop."). And we address the legal basis for Patterson's frisking below.

All told, the traffic stop lasted only seven minutes before the officers established reasonable suspicion for further detention. Its duration did not violate Patterson's Fourth Amendment rights.

B. REASONABLE SUSPICION

For state troopers like Sandford and Burr, traffic stops are often "fraught with danger." *Pacheco*, 841 F.3d at 390. So, they may order drivers and passengers out of their vehicles without independent justification. *Id*. Troopers may also perform precautionary searches, referred to as frisks or pat downs, but only when they have "'reasonable suspicion' that the person searched may be armed and dangerous." *Id.* (quoting *Knowles v. Iowa*, 525 U.S. 113, 118, 119 (1998)).

"Reasonable suspicion is based on the totality of the circumstances." *Id.* (quoting *Joshua v. DeWitt*, 341 F.3d 430, 443 (6th Cir. 2003)). The test requires us to ask whether "a reasonably prudent [person] in the circumstances would be warranted in the belief that his [or her] safety or that of others was in danger." *Noble*, 762 F.3d at 521–22 (quoting *Terry*, 392 U.S. at 27). Patterson contends that Sandford had no reasonable suspicion to detain him or to frisk him. We see things differently on both fronts.

The circumstances leading to Sandford's detention and frisk of Patterson began with the troopers' flashing their emergency lights signaling the vehicle to pull over. The vehicle, however, traveled north at a very slow pace—five to ten miles an hour—for about a quarter mile before

stopping. The Supreme Court has recognized time and again that "evasive behavior is a pertinent factor in determining reasonable suspicion." *Illinois v. Wardlow*, 528 U.S. 119,124 (2000). According to Sandford, who has nearly 10 years of law enforcement experience, the vehicle's slow-roll stop could mean either that the occupants were trying to grab their wallets and paperwork or that they were attempting to hide something—like an illegal substance or a weapon.

But that's not all. After approaching the driver-side window, Sandford observed Patterson acting unusually nervous and breathing heavily. Patterson also failed to respond to Sandford's initial questioning; he was "frozen" and did not "blink." Even when Patterson eventually spoke, he stared straight ahead and made no eye contact with Sandford. Naturally, none of this established reasonable suspicion on its own. Being pulled over by a police officer can be unnerving. Sandford admitted as much. Moreover, we have cautioned against relying on nervousness for an officer's reasonable suspicion of dangerousness. *See United States v. Pedicini*, 804 F. App'x 351, 355 (6th Cir. 2020) (quoting *Noble*, 762 F.3d at 522) (recognizing that "nervousness—even extreme nervousness—'is an unreliable indicator' of someone's dangerousness, 'especially in the context of a traffic stop.'"). But we have also made clear that a driver or passenger's nervousness and failure to make eye contact with a questioning officer are factors in our "totality-of-the-circumstances analysis" that can support a finding of reasonable suspicion. *Pacheco*, 841 F.3d at 393. Patterson's decision to ignore Sandford's initial questioning is also not determinative, but it too adds to our calculus. *See Wardlow*, 528 U.S. at 125 (noting that "refusal to cooperate, *without more*, does not furnish the minimal level of objective justification needed for a detention or seizure" (emphasis added)).

So too does the discovery that Rone had prior contacts with law enforcement for drug-related offenses. Our cases on the role of criminal history are not entirely consistent but can be

read as splitting in two directions. *See United States v. Stepp*, 680 F.3d 651, 667 (6th Cir. 2012). In one direction, for example, we have held that an officer's mere knowledge that an individual has a criminal history does not create reasonable suspicion, even when combined with other weak factors. *Id.* (citing *DeWitt,* 341 F.3d at 446). In the other, we have held that an officer's knowledge that an individual associated with someone suspected of drug dealing immediately prior to entering a vehicle contributes to reasonable suspicion. *Id.* (citing *United States v. Davis*, 430 F.3d 345, 354–55 (6th Cir. 2005)). Patterson's case is closer to the latter category. While not directly analogous to *Davis*—where the defendant's association was observed during a suspected drug deal, *see* 420 F.3d at 354–55—here, Patterson was associating with an individual, Rone, who had a record of drug offenses. The criminal history reports on Rone were specific to the suspicions Sandford was developing—that the occupants of the vehicle might be involved in the drug trade— and thus further support Sandford's reasonable suspicion that they might be armed and dangerous. *See Stepp*, 680 F.3d at 667; *see also Wright v. City of Euclid*, 962 F.3d 852, 865–66 (6th Cir. 2020) (noting that when an individual is "reasonably suspected of carrying drugs, an officer is entitled to rely on [his] experience and training in concluding that weapons are frequently used in drug transactions" (internal quotation marks omitted)).

All of those factors support the reasonable suspicion finding, but they may not be independently dispositive; we normally require some corroboration that individuals are traveling with narcotics or carrying weapons before sanctioning a detention or frisk. *See Noble*, 762 F.3d at 524 (citing cases). That corroboration existed for Sandford's detention and frisk of Patterson. After approaching the vehicle for a second time to re-examine Rone's proof of insurance, Sandford and Burr noticed an open container of alcohol in the backseat—a violation of Michigan law, prompting Burr to ask Randle, the closest to the bottle, to step out of the vehicle. While frisking

Randle, Burr discovered and alerted Sandford to the drugs and ammunition in Randle's pockets.[1]

Once Sandford learned of the ammunition, he had reason to suspect that Patterson (who was sitting alone in the front seat) might be armed, especially after considering the other circumstances leading to the ammunition's discovery. *See United States v. Burns*, 298 F.3d 523, 542 (6th Cir. 2002) ("Once the car was stopped, the fact that one of the passengers was thought to have a gun provided the officers with a reasonable suspicion to believe that a weapon might be present. The officers were therefore entitled to conduct a limited search for weapons under *Terry*."); *see also United States v. Sanchez*, 519 F.3d 1208, 1216 (10th Cir. 2008) (holding that after discovery of concealed weapon on the driver of the vehicle, police had reasonable suspicion to believe that occupants of the vehicle were armed and dangerous and thus could perform a frisk of the occupants).

As indicated, most of the circumstances mentioned above, when viewed in isolation from each other, might not have established reasonable suspicion for Sandford's frisk of Patterson. But when considered together, they do. *See, e.g.*, *Pacheco*, 841 F.3d at 394 (holding that a series of events might be innocent in isolation but warrant further investigation when viewed in full).

In reaching this conclusion, we find no merit in Patterson's argument that the district court clearly erred when it found that Sandford knew of the ammunition in Randle's pocket before frisking him. In our view, Patterson's understanding of the facts is in error, not the district court's.[2]

---

[1] Patterson does not argue that Burr's frisk of Randle was inappropriate, so we do not specifically address that search.

[2] Patterson raised this factual argument for the first time when he moved the district court to reconsider its denial of his first motion to suppress. Normally, we would not consider an argument raised for the first time in a motion for reconsideration. *Evanston Ins. Co. v. Cogswell Properties, LLC*, 683 F.3d 684, 692 (6th Cir. 2012). But here, Patterson also raised the argument in his second motion to suppress, filed on the same day as his motion for reconsideration.

Additionally, to the extent Patterson submits that this argument requires us to reverse the district court's denial of his motion for reconsideration (in addition to his second motion to suppress), he is mistaken. The district court correctly denied Patterson's motion for reconsideration because Patterson had not raised his factual argument in his first motion

According to Sandford's testimony, Trooper Burr first observed the open container in the backseat of the vehicle and then asked Randle to step out from the backseat. Burr then frisked Randle, and "[a]lmost immediately" looked over the top of the vehicle to tell Sandford what he had found in Randle's pockets: hydrocodone pills and two rounds of .380 ammunition. Only after that point did Sandford move towards the passenger-side door to make sure Patterson was not armed.

The troopers' dash cam footage corroborates Sandford's account. *See Scott v. Harris*, 550 U.S. 372, 380–81 (2007) (advising courts of appeals to "view[] the facts in the light depicted by the videotape"). The footage shows Burr patting down Randle, then saying something inaudible to Sandford, who stood by the driver-side door questioning Rone. At that point—and consistent with Sandford's testimony that the comment referred to Burr's discovery of ammunition—both troopers immediately unclip their gun holsters, a signal of their suspicion that someone in the car might be armed and dangerous. About a minute later, Sandford approaches the front passenger-side door, where Patterson is sitting, to request that Patterson step out of the vehicle to be handcuffed and patted down. We need not detail the footage any further. The district court's factual finding was sound, as was its legal determination that Sandford had reasonable suspicion to detain and frisk Patterson.

C. POCKET MANIPULATION

Patterson argues in the alternative that Sandford's manipulation of his pocket was a violation of the plain-feel doctrine, and that the district court should have suppressed the drugs Sandford found. We disagree.

---

to suppress. *Id.* ("[A] motion for reconsideration may not be used to raise issues that could have been raised in the previous motion.").

If a frisk extends beyond what is "necessary to determine if the suspect is armed, it is no longer valid under *Terry* and its fruits will be suppressed." *Pacheco*, 841 F.3d at 394 (quoting *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993)). Notably, however, "an officer does not need to ignore contraband should any be discovered." *Id.* Under the plain-feel doctrine, contraband may be seized during a *Terry* pat down if the police are in a lawful position from which to feel and access the object, and if the object's incriminating nature is immediately apparent. *Id.* at 394–95. Having already determined that Sandford was permitted to stop the car, remove Patterson, and pat him down, the only issue that remains is whether the object's incriminating nature was immediately apparent.

Our decision in *Pacheco* dictates the outcome here. There, the officer felt a hard substance wrapped in a bag in the suspect's pocket. *Id.* at 395. We credited the district court's factual finding that the officer, based on his training and experience, quickly recognized the item as packaged drugs. *Id.* at 396. Similarly, here, Sandford felt a hard substance wrapped in a bag in Patterson's pocket. Based on his training and experience, and without having to further manipulate the object, he quickly deduced that it was "likely some kind of packaged narcotics." It was thus permissible for Sandford to seize the package. *Id.* at 395–96; *see also United States v. Southard*, 20 F. App'x 304, 306 (6th Cir. 2001) (holding that seizure of contraband was valid under the plain-feel doctrine where the officer did not have to manipulate the object during the frisk to deduce its contents). In our review here, as in *Pacheco*, we are "duly mindful of the executing officers' particular, subjective training and experiences." *Pacheco*, at 395–96 (quoting *United States v. Szymkowiak*, 727 F.2d 95, 98 (6th Cir. 1984)). As was the district court, which credited Sandford's testimony. To do so was not clearly erroneous. *Id.* (reviewing issue for clear error); *see also United States v. Arvizu*, 534 U.S. 266, 276–77 (2002) (noting the "due weight" given to the district court's factual

inferences due to its "superior access to the evidence and the well-recognized inability of reviewing courts to reconstruct what happened in the courtroom").

IV.

The district court committed no error in denying Patterson's two motions to suppress and no abuse of discretion in denying his motion for reconsideration. We affirm the judgment of conviction.